[No. S009108. June 8, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALDO MEDRANO AYALA, Defendant and Appellant.

240

## COUNSEL

Andrew Parnes and E. Evans Young, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Laura Whitcomb Halgren, William M. Wood and Steven T. Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—The San Diego County District Attorney filed an amended information on January 20, 1987, charging defendant with three murders and other offenses. The information alleged that the crimes all occurred on or about April 26, 1985.

Count 1 charged defendant with murder in the death of Jose Luis Rositas (Pen. Code, § 187; all unlabeled statutory references are to this code). Counts 2 and 3 contained the same charge in the deaths of Marcos Antonio Zamora and Ernesto Dominguez Mendez (Dominguez) respectively. Count 4 charged him with the attempted murder of Pedro Castillo (§§ 187, 664), and count 5 with robbing him (§ 211). Count 6, which the trial court later dismissed, and which the jury did not consider, charged him with robbing Zamora. Counts 7, 8, and 9 charged him with the attempted robbery of Dominguez, Rositas, and Zamora respectively (§§ 211, 664). The first six counts were accompanied by allegations that defendant personally used a firearm (§ 12022.5).

The amended information alleged that defendant committed the special circumstances of multiple murder (§ 190.2, subd. (a)(3)) and murder while attempting to commit robbery (§ 190.2, former subd. (a)(17)(i); see now § 190.2, subd. (a)(17)(A)).

The amended information further alleged that defendant had been convicted of other offenses: second degree burglary (§ 459) and unlawful use of a motor vehicle (Veh. Code, § 10851) in San Diego County in 1971, crimes for which he received probation; robbery (§ 211) in San Diego County in 1973, possessing a deadly weapon in prison (§ 4502) in Monterey County in 1974, first degree burglary (§ 459) in San Diego County in 1980, and possessing a controlled substance (Health & Saf. Code, § 11350) in 1981, those four crimes falling within the ambit of section 667.5, subdivision (b); and that the robbery and first degree burglary also constituted serious felonies under sections 667, subdivision (a), and 1192.7, subdivision (c).

The case was called for trial on April 15, 1988. On October 12, 1988, the jury convicted defendant of all the offenses charged. (None of the determinate terms is at issue here.) The jury also found, with respect to the remaining counts where it was alleged, and also with respect to the charge of attempting to rob Zamora (count 8 as renumbered), that defendant had personally used a firearm within the meaning of section 12022.5. It further found the special circumstance allegations true. Defendant waived his right to have the prior offense allegations tried before a jury, and the court found them true.

Following a penalty trial, the jury returned a verdict of death on counts 1, 2, and 3 on December 12, 1988, and the trial court entered judgment in accordance with the verdict. The appeal to this court is automatic.

### The Guilt Phase

*Facts*

The defendant herein, Ronaldo Medrano Ayala, and his brother Hector Juan Ayala, murdered Dominguez, Rositas and Zamora after holding them captive in an automobile repair shop. The Ayalas would have killed their fourth intended murder victim, Castillo, but he improvised an escape plan and, though shot, survived. The prosecution also presented evidence that a third man, Jose Moreno (also known as Joe Moreno and Joseph Suarez Moreno and by his nickname Cucuy)[1] helped to perpetrate the crimes.

Castillo provided the information that led to defendant's arrest, and served as the prosecution's key witness at trial.

The People were represented by William Woodward and Gloria Michaels; defendant by Elisabeth Semel and Robert Boyce. Opening statements and presentation of evidence began on August 3, 1988. San Diego Police Detective Richard Carey testified that on April 26, 1985, his homicide team was summoned to the New Life automobile detailing and body repair shop located at 999 South Forty-third Street, on the east side of that street between Logan and National Avenues in southeast San Diego. He found Dominguez's, Zamora's and Rositas's bodies in the shop office. All had been shot. A forensic pathologist, Dr. David Masamichi Katsuyama, testified that each had died from two gunshots to the head.

*Prosecution Case*

The prosecution theorized that the murders resulted from a robbery attempt that failed because it was based on the perpetrators' incorrect speculation that Dominguez had just returned from Mexico with a quantity of narcotics or cash. Castillo testified that a week before the killings he spoke with Hector Ayala about Dominguez's whereabouts. Dominguez was in jail, apparently for minor offenses. An investigator testified that Dominguez was released the day before his murder. But Dominguez told Castillo to tell anybody asking that he was in Mexico, and Castillo so told Hector Ayala. The prosecution told the jury in its opening statement that Dominguez

---

[1]Nicknames figured throughout the trial. Two of the three murder victims had such nicknames: Dominguez (Chacho) and Rositas (Pepe). The third, Marcos Zamora, did not.

invented the story about Mexico because he was embarrassed about being in jail and did not want his whereabouts disclosed.

Juan Manuel Meza provided important testimony regarding motive and intent. Meza, a heroin addict at the time of the murders who had a $100- to $200-per-day habit, testified that about a month before the killings defendant, in the presence of Meza and Hector Ayala, proposed to rob the automobile body shop. About a week after that event, Hector Ayala told Meza that Dominguez had gone to Tijuana to buy drugs. Nine days before the murders Meza attended a meeting that Hector Ayala had called at his house. Defendant was also present. As defendant prepared to use heroin in the living room, Hector Ayala emerged from the bedroom displaying a .38-caliber Smith & Wesson revolver in poor condition. He asked Meza if he could use some of Meza's guns, which were of better quality, for the impending robbery. The three discussed a plan for the crime, in which they would be the only participants; defendant said, in Meza's words, that it would be "easy . . . to just go in, line them all up, lay them down, tie them up and wait for [the victims to divulge the location of] the drugs" and money—one pound of heroin and $10,000—that they believed Dominguez would have after his trip to Mexico. Defendant asked Meza to perform the task of binding the victims. During the planning meeting defendant said, in Meza's words, that "we didn't want any witnesses" and "that they were to die." They were prepared to kill as many as five people if necessary to ensure that no witnesses remained alive.

Meza testified that he told defendant and Hector Ayala that he would provide the requested guns and participate in the robbery, but that the promise was a falsehood. Rather, because he feared that he would be killed in the aftermath, he did not intend to do anything.

The weekend before the murders, Meza encountered Hector Ayala and Moreno by chance at a liquor store in National City. They went to Hector Ayala's house to use drugs, and Hector Ayala asked Moreno to be the driver for the planned robbery. Moreno agreed, and offered to bring a .22-caliber gun.

Two days before the killings, Hector Ayala told Meza to stand by at his house to be picked up between 5:00 and 6:00 p.m. on the day of the murders. Meza continued to pretend that he would participate, but instead, he left his house early in the afternoon of the day of the killings, and did not return until about 10:00 p.m. Meza's wife testified that Hector Ayala appeared at their house at 10:00 a.m. and 5:00 p.m. that day, that her husband was not there at either time, and that Ayala was annoyed.

Meza acknowledged in court that he was convicted of robbery in 1975, attempted taking of another's motor vehicle in 1985, and possession for sale of cocaine in 1987, and that he was still incarcerated for the drug offense. He testified that in exchange for his agreeing to testify in this case the district attorney's office had arranged to protect his family, and also would ask his sentencing judge to reconsider his sentence and order his release from prison. His agreement with the prosecution required him to testify truthfully, and he had signed a document to that effect.

Castillo testified that Dominguez returned to work the day before the killings and was drinking and chatting in the body shop with all three perpetrators.

Castillo was Dominguez's employee. He testified that Dominguez and Zamora, who was Dominguez's brother-in-law, ran a heroin distribution business at the shop. Castillo volunteered on direct examination that on occasion he had helped distribute heroin from the premises. Defendant and Hector Ayala would visit the shop, retreat into the office, and reappear showing symptoms of having used heroin inside. Evidently either Dominguez or Zamora would sell it to them. Castillo, who was himself a user of heroin until the day of the murders, could obtain a better grade of the drug elsewhere and thus did not buy it from the body shop.

Castillo testified that he first saw defendant appear at Dominguez's shop about four months before the killings, and thereafter he visited two to three times a week, usually in the company of Hector Ayala or Moreno. From the time that Dominguez acquired the business, Hector Ayala also had been a regular visitor.

About noon on the day of the killings, Castillo injected a dose of heroin off the premises and returned to work at the shop. The drug had a stabilizing effect on Castillo, who also testified that using it that day did not impair his memory or his ability to work.

About 5:00 p.m. Castillo returned some $600 in cash to Zamora. Zamora had given him the money to buy an engine, but Castillo had not been able to buy it that day.

About 6:00 p.m. Castillo, still working on cars, saw defendant, Hector Ayala, and Moreno on the premises. Later, at dusk, he looked up and saw Hector Ayala pointing a pistol at his head. Hector Ayala escorted him to the office at gunpoint, where defendant, Dominguez, Zamora, and Rositas were also present. Defendant was also holding a gun. Zamora was lying on his

side; Rositas was in a crouch. They and Dominguez all had their hands bound behind their backs.

Hector Ayala said to Dominguez, "Yeah, Chacho, you thought you were real smart. Didn't you know you had to go through us?"

Moreno then bound Castillo's hands behind his back with duct tape. Castillo had become "clear-headed" and was focused on the victims' predicament, and when Moreno was taping him he tried to shift his hands so as to "not let[] the tape get bonded properly, because I—I felt that I had to get my hands loose."

Defendant "demanded $10,000 or someone was going to die," Castillo further testified. Apparently nobody had such a sum, but Castillo volunteered that he had hidden some money under the driver's seat of a tow truck parked outside—a ruse, as he had money only in his pocket.

Defendant and Hector Ayala debated whether to escort Castillo to the tow truck, and Hector Ayala warned Castillo that "if you're lying, I'm going to blow you away," in Castillo's words. Hector Ayala directed Moreno to check the truck. About that time Hector Ayala also removed money from Castillo's pocket.

Before Moreno had even returned, Hector Ayala accused Castillo of lying and stabbed him in the upper left leg. Moreno returned and informed his accomplices that the truck contained no money. Defendant urged that Castillo be taken out to get the money, but Hector Ayala disagreed. Defendant shoved his brother and quieted him, and then with a gun in one hand, began to escort Castillo outside, holding him by his jacket with the other hand and warning him that if he tried to run when the garage door opened— precisely Castillo's plan—he would kill him.

Defendant told Moreno to open the garage door slowly, and Castillo feigned that he was trying to squeeze under it, but could not do so. In fact his feint was disguising the fact that he was propping the door up with his body. Unknown to the assailants, the door was defective, and would slam down unless supported. Once Moreno had raised it far enough for Castillo to escape, and also had relaxed his own hold on the door (which Castillo could sense by the door's weight on him), Castillo bolted underneath, and the door slammed down, surprising defendant and Moreno.

Still bound at the hands, Castillo ran toward the street. Defendant and Moreno managed to open the garage door and shots were fired at Castillo,

wounding him in the back. (A radiologist's later testimony established that a .22-caliber projectile lodged in his abdominal area.) He fell onto Forty-third Street. At the same time as he was shot, he heard two shots ring out, and, while lying in the street shortly thereafter, six more, consisting of three sets of two closely timed shots each, and lasting a total of some five seconds. Meanwhile he was yelling for help. He then saw three silhouettes exit the shop. Simultaneously, he saw a police car turn the corner from Logan Avenue onto Forty-third Street. Apparently he lost consciousness, and "the next thing I remember, I was on top of the officers' hood of the car, and I was pointing towards the garage. I think I was saying, 'In there, in there.'" After an officer ran back to the police car "I think I asked him, 'what happened?' He said, 'Your three buddies are dead.'"

Castillo, who described himself as "almost dead" or "half dead" after being shot, had virtually no memory of being transported to the hospital, examined, or treated.[2] The first discussion with the police that he could recall occurred in a hospital room, apparently after surgery. At that time he feared for his and his family's safety—a concern evidently shared by the police, who kept a guard in his room and arranged for him to be registered in the hospital under a pseudonym. Officer Mills testified that in the ambulance Castillo said he had never seen the perpetrators before. Only eventually, two days after the murders, did he tell the police that they were defendant, Hector Ayala, and Moreno. He identified them in photographic lineups from his hospital bed.

Castillo acknowledged that at the preliminary hearing he had testified falsely with respect to heroin-related activity at the body shop, denying any knowledge that Dominguez or Zamora used or sold the drug. He testified at trial that he did this for the sake of the murder victims' families: he did not want to taint their memories of the dead.

On cross-examination, counsel questioned Castillo extensively regarding details of the body shop's parallel drug-merchandising business. She also asked him about statements he had made knowing them to be false, about other inconsistencies in his prior descriptions of facts or events, and about the accuracy of his memory. Despite this, the defense was unable to undermine his description of the events surrounding the murders.

Parts of Castillo's testimony were confirmed by the testimony of Miguel Angel "Pelon" Lopez, who lived in an ice cream truck and worked at a tire

---

[2]At trial, witnesses' descriptions of Castillo's mental state in the ambulance varied. The two attending paramedics later testified that he was conscious and alert during the ride. An accompanying police officer, Jerald E. Mills, testified that Castillo was able to answer several questions, but that he was in pain, his condition worsened during the trip, and his ability to respond to questions would appear to fluctuate—he was "perhaps fading in and out."

shop, both of which were located on the premises of 999 South Forty-third Street. Lopez said that after he closed the tire shop at 5:00 p.m. the day of the killings, he saw defendant and Hector Ayala. Just before 8:00 p.m. he went to watch a San Diego Padres-Los Angeles Dodgers baseball game in his truck, and during the game he heard one shot ring out from the area of the body shop. He emerged to see Castillo run toward and fall onto Forty-third Street, and he heard four more shots come from inside the body shop—two sets of two.

There was testimony that defendant's fingerprints had been found on beer cans recovered from the body shop office.

A police officer, Tony D. McElroy, testified that he found Castillo in the street and discovered bodies inside the automobile body shop. He questioned Castillo, who told him after a few responses that he only wanted to answer further questions with a lawyer present.

A paramedic, Wayne Johnson, testified that the blood from two of the murder victims showed that they had bled shortly before he saw them at the crime scene. He did not remember the state of the third victim's blood. Finding that none could be treated, he did not try to administer medical aid.

*Defense Case*

Defendant did not testify at the guilt phase. But the defense theory was that Castillo was in league with the probable actual killers: two young Latino men, one of whom was wearing a red plaid shirt of the Pendleton brand or type.

During the prosecution's case-in-chief a police detective testified that Castillo, while in the ambulance on the way to the hospital, said he did not know the killers and that one of them was wearing a red plaid shirt. The next day in the hospital, Castillo repeated that information, saying, according to the testimony of another detective, that one of the killers was wearing a red Pendleton shirt.

Traci Lynn Pittman testified that on the night of the murders she was at a liquor store across Forty-third Street. She saw two slender Hispanic men walk from that liquor store to the complex containing the automobile body shop and disappear into it. One of the men was in his early 20's and was five feet seven to five feet eight inches tall. As he passed her he appeared to be concealing a bulky object, which could have been a gun, underneath his red Pendleton shirt. The other was the same age, but shorter, perhaps five feet

six or five feet seven inches. Neither looked the same as defendant or Hector Ayala. The lighting at the scene was poor and she could not see where they went. But about two minutes later a man (evidently Castillo) emerged running from the complex and fell onto Forty-third Street as two shots rang out. Pittman took shelter in the liquor store and from inside heard three, or possibly four, more shots.

A fingerprint expert testified that a fingerprint found on the duct tape used to bind Dominguez was not defendant's. Nor did it belong to any of the victims or other identified perpetrators; it belonged to an unknown person.

Rafael "Rafa" Mendoza Lopez (Mendoza) had been Dominguez's friend since 1976. The purpose of his testimony was to suggest to the jury that Castillo's involvement in drugs extended beyond personal use and low-level delivery errands, and that he might have been in league with others who committed the murders.

Mendoza testified that he was using heroin in 1985 and that if he needed the drug after Dominguez's automobile body shop had closed he would obtain it at Castillo's house or, at Castillo's direction, at Zamora's. Dominguez sold drugs from two locations and was rarely present at the 999 South Forty-third Street business; in his absence, Castillo, Zamora, and Sergio "Tony" Mancilla Hernandez would transact the sale.

On the day of the murders, Mendoza went to the automobile body shop and noticed two or three men he had never seen before. It was possible that their accent and demeanor identified them as Mexican residents. He met Castillo, and the two went to a car in the lot that Mendoza was to fill with gasoline. Castillo rummaged in the trunk, extracted a bundle of clothing that contained two guns, and mentioned that "he was waiting for some people from Mexico." When Mendoza returned from a nearby Chevron station, Castillo was chatting with the group of Mexicans.

On rebuttal, as described below, Mendoza recanted his testimony in important respects.

A handwriting expert buttressed the defense's theory of Castillo's role by testifying that Castillo had written text that evidently referred to heroin sales.

*Prosecution's Rebuttal*

The prosecution presented a brief rebuttal case. The prosecution's fingerprint expert, disagreeing with defendant's, testified that Dominguez might

have left the fingerprint that was found on the duct tape. And Castillo testified in order to rebut the implications of Mendoza's testimony. He denied having had Mendoza fill a car with gasoline on the day of the murders, or keeping guns or clothes in the trunk of any car. He also denied seeing any mysterious Mexicans on the premises that day, or that he told anyone he was expecting any Mexicans to arrive later.

As stated, Mendoza appeared as a prosecution witness on rebuttal to recant his prior testimony. He also provided important new evidence against defendant, showing his consciousness of guilt.

Mendoza testified that, contrary to his prior testimony, Castillo did not show him any guns on the day of the murders, nor was there present a group of unknown Mexicans. Mendoza explained that he gave his false prior testimony at defendant's request. Mendoza had heard that defendant wished to see him, and he felt forced to visit him and Hector Ayala in the county jail in June or July of 1985. During the visit, defendant held a written note against a glass partition separating him from Mendoza. The note directed Mendoza to contact an investigator and give him the false story. Defendant told him to explain that two guns were involved, one of them chrome plated: a .22-caliber and a .38-caliber weapon. The note explained, in Mendoza's words, that "what happened to [Dominguez] had to happen." He explained that he had testified falsely because he feared that otherwise defendant would seek deadly revenge against him.

On cross-examination, defense counsel asked Mendoza to describe the size of the paper defendant purportedly showed him, and he answered about five by six inches. She asked him how a piece of paper that size could convey the amount of information he had described on direct examination, and how he could absorb defendant's written instructions in a jail visiting room regularly subject to monitoring. She also succeeded in introducing chronological evidence that cast considerable doubt on the credibility of Mendoza's recantation. Contrary to Mendoza's direct testimony, he could not have gone to the jailhouse meeting in June or July of 1985 accompanied by another individual known by the nickname "Rudy Green Eyes," because that person, whose real name was shown in federal records as Rudy Ayala Ybarra (or possibly Ibarra), was a federal prisoner continuously from 1982 to December 1985, and was imprisoned in Tucson, Arizona, from June 5, 1985, to October 28 of that year.

*Argument*

The prosecutor began his closing argument by suggesting to the jury that it could rest its verdict on Castillo's testimony alone. He argued that because

Rositas, Zamora, and Dominguez were murdered execution-style, the murders were premeditated and deliberate. He argued that because the victims died during a robbery, defendant was also guilty of first degree murder on a felony-murder theory. He characterized defendant's case as consisting of attempts to distract from the core facts, and emphasized his ruthlessness, as revealed by the murders and the fear he had instilled in certain witnesses.

For her part at closing argument, defense counsel impugned the honesty of the prosecution witnesses and the consistency of their testimony. She argued that the absence of these qualities and the "many, many unanswered questions in this case" required the jury to find that the case had not been proven beyond a reasonable doubt. Castillo had lied at the preliminary hearing about Dominguez's drug business, and continued to evade the truth. He needed to lie to conceal his own involvement in the murders—he was actually one of the perpetrators until something went awry. The story of his escape was too miraculous to be true. Rather, Castillo was involved with the two men that Pittman had seen—the actual killers, the men Castillo originally described, one of whom wore a red Pendleton shirt. There were many other chronological or logical improbabilities or impossibilities in the evidence presented by the prosecution—certainly too many for the jury to convict defendant beyond a reasonable doubt.

Defense counsel further disputed the truth of Mendoza's recantation. She questioned the likelihood of defendant's carrying around and displaying a note in the county jail that admitted committing a triple murder, and that Mendoza could memorize all the information that he claimed to have obtained from the small piece of paper.

In rebuttal, the prosecutor argued that the two Hispanic men coming from the liquor store across the street could not have bound and killed three men in the very short time that elapsed between the time Pittman saw them cross Forty-third Street to the time she saw Castillo collapse on that street and heard shots fired.

## Issues on Appeal

### I. Magnetometer Screening

Defendant contends that placing a magnetometer (i.e., a metal detector) at the public entrance to the courtroom violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and their equivalent guaranties in the California Constitution.

The prosecution, stating that defendant had a history of violence and was reported to be a member of a well-known prison gang, some of whose

members might wish to attend the trial, moved to have a magnetometer placed outside the courtroom. The motion stated that the security measure was needed to safeguard defendant himself and those who might testify against him. It stated specifically that "Castillo is, as is a matter of record, in the witness protection program and past solicitations to kill him are a matter of record." The prosecution noted that it was not requesting that defendant be shackled as long as "there is some reasonable assurance that spectators who may attend the court proceedings are not armed . . . ."

Defendant responded to the request on procedural and substantive grounds. He requested an evidentiary hearing to refute the motion's factual allegations. He asserted that his constitutional right to due process of law compelled the trial court to convene such a hearing. And, arguing as a matter of state law, he maintained that a magnetometer's presence would prejudice the jury against him.

Without calling witnesses, the trial court conducted a hearing. After hearing argument, it stated that "[t]his court would be naive, and I think counsel would be naive, to assume that this court has not become aware of allegations that have surfaced concerning the membership in various gangs of various potential witnesses in this case. It's also a known fact that threats allegedly were made as to Mr. Castillo." The court also noted that one potential witness had claimed to have been a member of the Mexican Mafia (a prison-based gang also known as La Eme, the Spanish word for the letter "M," and frequently referred to in the trial proceedings by that term), and that another may have been a member of the Aryan Brotherhood, a different prison gang. Describing a magnetometer as "unobtrusive" and "nondiscriminatory," the court decided that it would order one to be used during the evidentiary portion of the trial. It implicitly denied defendant's request for an evidentiary hearing.

Defendant apparently sought a writ of mandate against the order in the Court of Appeal, which rejected it. Thereafter he moved for the trial court to reconsider its decision, but it also refused. Instead, at his request, it instructed the jury, immediately after the alternate jurors had been sworn, to disregard the magnetometer's presence. "[I]t is my policy in serious felony cases to have everyone except jurors pass through a metal detector before entering the courtroom. [¶] Therefore, you can expect that a metal detector will be placed outside the courtroom when the trial begins, and it will remain throughout the course of the trial. [¶] The practices of other judges in this courthouse differ from courtroom to courtroom. You should not view the presence of a metal detector outside this courtroom, or the absence of one outside other courtrooms, as a reflection on either party or any of the witnesses. [¶] It is solely a matter of my personal policy."

In bringing his claim, defendant relies, as he did at trial, on *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]. Though he labels his claim one of constitutional error, its substance is of state law error, namely a violation of *Duran.*

Through *Duran* and its progeny, it has become settled that "because of its potentially prejudicial impact on the jury, shackling should be ordered only as a last resort and only upon a showing of a manifest need for such restraints. [Citations.] Any restraints should be as 'unobtrusive as possible, although as effective as necessary under the circumstances.' [Citation.] Although these restrictions make the trial court's discretion to order restraints 'relatively narrow' [citation], the court's ruling will be upheld on appeal absent a showing of a manifest abuse of that discretion." (*People v. Livaditis* (1992) 2 Cal.4th 759, 774 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

But *Duran* is inapposite. Here, unlike the situation in *People v. Duran, supra,* 16 Cal.3d 282, defendant was not shackled. Rather, a magnetometer was placed by the courtroom door. Unlike occasions on which the government can be accused of creating a public spectacle or directing suspicion at a criminal defendant by parading him or her in shackles, or driving him or her to court in an ostentatious manner, the trial court's use of a magnetometer was, as it observed, "nondiscriminatory." (Cf. *Holbrook v. Flynn* (1986) 475 U.S. 560, 567 [106 S.Ct. 1340, 1344-1345, 89 L.Ed.2d 525].)

In *People v. Duran, supra,* 16 Cal.3d 282, we stated that the presence of armed guards ordinarily "need not be justified by the court or the prosecutor." (*Id.* at p. 291, fn. 8; see also generally *Holbrook v. Flynn, supra,* 475 U.S. 560 [discussing the presence of uniformed and armed personnel].) "We believe that the use of a metal detector outside a courtroom, like the use of additional security forces within the courtroom, is not . . . inherently prejudicial. . . . Unlike shackling and the display of the defendant in jail garb, the use of a metal detector does not identify the defendant as a person apart or as worthy of fear and suspicion." (*People v. Jenkins* (2000) 22 Cal.4th 900, 996 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

To the extent the metal detector's use focused attention on the proceedings, it pointed to the nature of the case, not to defendant's character. (See *People v. Miranda* (1987) 44 Cal.3d 57, 114-115 [241 Cal.Rptr. 594, 744 P.2d 1127].) The distinction is crucial. Nor did the magnetometer *improperly* highlight the nature of the case. The jurors already knew they were hearing a multiple murder trial and that "the defendant appearing before them did not arrive there by choice or happenstance." (*Holbrook v. Flynn, supra,* 475 U.S. 560, 567 [106 S.Ct. 1340, 1345].) Hence the magnetometer's presence did

not objectionably dramatize the proceedings. The device was, in its neutrality, akin to that of, and indeed likely less dramatic than, the use of armed guards in the courtroom.

"A trial court has broad power to maintain courtroom security and orderly proceedings." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645].) Accordingly, we review the court's decisions regarding security measures in the courtroom, including deploying a magnetometer at the entrance, for an abuse of discretion. (*Ibid.*; *People v. Jenkins, supra,* 22 Cal.4th 990, 997.) We find none. The court was entitled to rely and act on the prosecutor's representations, as an officer of the court, that bringing the case to trial posed certain risks. There was no violation of state law, and because defendant's constitutional claims are predicated on his assertion that state law was violated, they too must fail.

We turn next to defendant's procedural claim: that it violated due process to install a magnetometer without an evidentiary hearing. We do not agree that due process requires a contested evidentiary proceeding. It is well known that " ' "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." ' " (*People v. Tilbury* (1991) 54 Cal.3d 56, 68-69 [284 Cal.Rptr. 288, 813 P.2d 1318].) We have already explained that defendant's interest in a fair trial was unaffected by installing a magnetometer outside the courtroom: it was a neutral measure that did not focus attention on him. Holding a contested evidentiary hearing would not have been useful: it would have imposed a needless burden on the trial court, which, as we have explained, enjoys wide discretion to maintain courtroom security. It might have resulted in a wasteful minitrial at which witnesses would have had to testify about their gang affiliations or other potential for generating security problems. Neither the federal nor the state Constitution requires such consumption of the parties' and the trial court's time. Indeed, by holding a hearing of any kind, the trial court gave defendant more than he was entitled to. (*People v. Hayes, supra,* 21 Cal.4th 1211, 1268.)

II. *Search of the Garage Office and Seizure of Items Therefrom*

As stated, defendant's fingerprints were found on beer cans recovered from the automobile body shop office. At trial, he filed a motion to exclude evidence obtained from the search of the premises where the murders occurred. (§ 1538.5.) He claimed that (1) searching the premises, and (2) removing therefrom certain small items, namely "vodka containers, orange juice containers and beer cans in which [he had] a proprietary interest," violated his rights under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution.

The prosecution opposed the motion on the grounds that the premises did not belong to defendant and that the killers were only business invitees there even before they began their robbery; the search was a proper emergency search, followed by the police's continuous occupation of the premises; and defendant did not own and lacked any reasonable expectation of privacy in the seized items.

Referring explicitly to the seizure claim but apparently considering the search claim as well, the trial court ruled that defendant lacked standing[3] to invoke the Fourth Amendment, and rejected his motion on that ground. It also considered the merits of the seizure claim, but concluded that defendant had abandoned the seized items and lacked any expectation of privacy in them.

■ We apply the Fourth Amendment standard in deciding what remedy may be available following a claim of unlawful search or seizure. (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744]; *Bowens v. Superior Court* (1991) 1 Cal.4th 36, 47 [2 Cal.Rptr.2d 376, 820

---

[3]It should be noted that since *Rakas v. Illinois* (1978) 439 U.S. 128 [99 S.Ct. 421, 58 L.Ed.2d 387], the United States Supreme Court has largely abandoned use of the word "standing" in its Fourth Amendment analyses. (See *Minnesota v. Carter* (1998) 525 U.S. 83, 87 [119 S.Ct. 469, 472, 142 L.Ed.2d 373].) It did so without altering the nature of the inquiry: whether the defendant, rather than someone else, had a reasonable expectation of privacy in the place searched or the items seized. Despite the federal high court's change in terminology, some California cases have continued to use the word "standing" in discussing the Fourth Amendment. Among them are *People v. Badgett* (1995) 10 Cal.4th 330, 343, 351 [41 Cal.Rptr.2d 635, 895 P.2d 877]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1172 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People v. Satz* (1998) 61 Cal.App.4th 322, 324-325 [71 Cal.Rptr.2d 433]; *People v. Hannah* (1996) 51 Cal.App.4th 1335, 1340 [59 Cal.Rptr.2d 806]; *People v. Bell* (1996) 43 Cal.App.4th 754, 765 [51 Cal.Rptr.2d 115]; *People v. Scott* (1993) 17 Cal.App.4th 405, 411, footnote 5 [21 Cal.Rptr.2d 193]; *People v. Allen* (1993) 17 Cal.App.4th 1214, 1219 [21 Cal.Rptr.2d 668]; *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1895-1898 [9 Cal.Rptr.2d 798]; *People v. Williams* (1992) 3 Cal.App.4th 1535, 1543 [5 Cal.Rptr.2d 372]; *People v. Moreno* (1992) 2 Cal.App.4th 577, 587-588 [3 Cal.Rptr.2d 66]; *People v. Ybarra* (1991) 233 Cal.App.3d 1353, 1360 [285 Cal.Rptr. 200]; *In re Marcellus L.* (1991) 229 Cal.App.3d 134, 145 [279 Cal.Rptr. 901]; *People v. Thompson* (1990) 221 Cal.App.3d 923, 933 [270 Cal.Rptr. 863]; *People v. Henderson* (1990) 220 Cal.App.3d 1632, 1644 [270 Cal.Rptr. 248]; *People v. Workman* (1989) 209 Cal.App.3d 687, 695 [257 Cal.Rptr. 753]; *People v. Dasilva* (1989) 207 Cal.App.3d 43, 48-49 [254 Cal.Rptr. 563]; *People v. Root* (1985) 172 Cal.App.3d 774, 778 [218 Cal.Rptr. 182]; *People v. Hamilton* (1985) 168 Cal.App.3d 1058, 1066 [214 Cal.Rptr. 596]; *Pating v. Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 608, 616 [182 Cal.Rptr. 20]; *People v. De Caro* (1981) 123 Cal.App.3d 454, 465, footnote 7 [176 Cal.Rptr. 509]; *In re D.M.G.* (1981) 120 Cal.App.3d 218, 224, footnote 6 [174 Cal.Rptr. 557]; *People v. Thomas* (1980) 112 Cal.App.3d 980, 985 [169 Cal.Rptr. 570]; and *People v. Lionberger* (1986) 185 Cal.App.3d Supp. 1, 3 [230 Cal.Rptr. 358].

In the future, to avoid confusion with the federal high court's terminology, mention of "standing" should be avoided when analyzing a Fourth Amendment claim. (See *People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1368, fn. 8 [85 Cal.Rptr.2d 788] [commenting on the term's "vampiric persistence"].)

P.2d 600].) The inquiry is substantive in nature, and consists of a subjective and an objective component. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i. e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " (*Minnesota v. Carter, supra,* 525 U.S. 83, 88 [119 S.Ct. 469, 472].) "In other words, the defendant must show that he or she had a subjective expectation of privacy that was objectively reasonable." (*State v. Yakes* (1999) 226 Wis.2d 425, 430 [595 N.W.2d 108, 110].)

■ " 'An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review.' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 182 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

■ The claim is without merit. Even if defendant left the containers at the automobile body shop while there as an invitee or a social guest, he had no expectation of privacy in the premises. " ' "[O]ccasional presence on the premises as a mere guest or invitee" ' " is insufficient to confer such an expectation. (*U.S. v. Chaves* (11th Cir. 1999) 169 F.3d 687, 691.) Moreover, the trial court found that he had abandoned the containers—a factual finding supported by substantial evidence and to which, accordingly, we defer. Abandoning them, he relinquished any expectation of privacy in them. As a general matter, " 'the overwhelming weight of authority rejects the proposition that a reasonable expectation of privacy exists with respect to trash discarded outside the home and the curtilage thereof.' " (*People v. Machupa* (1994) 7 Cal.4th 614, 629, fn. 5 [29 Cal.Rptr.2d 775, 872 P.2d 114]; see *People v. Roybal* (1998) 19 Cal.4th 481, 507-508 [79 Cal.Rptr.2d 487, 966 P.2d 521]; see also *Abel v. United States* (1960) 362 U.S. 217, 240-241 [80 S.Ct. 683, 697-698, 4 L.Ed.2d 668].)

For the foregoing reasons, we find defendant's Fourth Amendment claims to lack merit, and reject them.

### III. *Representation of Hispanics and the Young in Jury Pool*

■ Defendant, who is Hispanic, contends that underrepresentation of Hispanics in the jury pool violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution. (*Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) He brought the same claim at trial, but the trial court rejected it.

The claim is without merit.

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364 [99 S.Ct. 664, 668, 58 L.Ed.2d 579].)

Defendant satisfies the first of these requirements. "Whether characterized on the basis of Spanish surname or self-identification, Hispanics are a cognizable population . . . ." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1154 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

Defendant cannot establish a prima facie case of systematic exclusion of Hispanics merely by presenting statistical evidence of underrepresentation in the jury pool, venire, or panel. He must show that any underrepresentation "is the result of an improper feature of the jury-selection process." (*People v. Howard* (1992) 1 Cal.4th 1132, 1160 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) The parties stipulated to use the prior testimony of the San Diego County coordinator of jury services. That individual had testified that every year the jury commissioner's office compiles the names of all registered voters and persons with a California driver's license or identification card onto a source list, which contains 2.5 million people. The county then uses a "sophisticated random sampling" technique to draw names from the source list to create a master list of 350,000 people, from which in turn individuals are summoned via a "second sophisticated random sampling" to form a venire.

The foregoing method does not discriminate on the basis of ethnicity or national origin. (*People v. Ramos, supra*, 15 Cal.4th 1133, 1156.) Hence, defendant has not shown that the jury selection process contained an "improper feature" (*People v. Howard, supra*, 1 Cal.4th 1132, 1160).

█ Defendant also claims that underrepresentation of the young violated his Sixth and Fourteenth Amendment rights. With regard to young people, the trial court ruled that the young are not a cognizable group, but even if it were, there was no improper exclusion of them in the jury-selection process.

"California courts have not been receptive to the argument that age alone identifies a distinctive or cognizable group within the meaning of [the representative cross-section] rule." (*People v. McCoy* (1995) 40 Cal.App.4th 778, 783 [47 Cal.Rptr.2d 599] [citing cases].) We need not decide, however, whether peremptory challenges on the basis of age violate the strictures of *Batson* or *Wheeler*; defendant simply does not persuade, any more than he does regarding Hispanic jurors, that the young were improperly excluded under the jury-selection system in place. As the People observe, aside from a mention of statistical disparity in the presence of young people as a result of the jury-selection process, a factor that does not by itself establish systematic exclusion, the only fault defendant finds with the process is that the master list of the jury pool was only updated annually, so that those who turned 18 during the year would not be included and some 18-year-olds would turn 19. We do not believe that amounts to systematic exclusion. In order to avoid that effect or a similar one, the master list would have to be updated daily. The law does not require such diligence.

## IV. *Granting Prosecution's Motion to Excuse for Cause*

█ Defendant contends that the trial court violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution when it excused certain prospective jurors. He claims that he received a lack of due process under the Fifth and Fourteenth Amendments and denial of his right to a reliable penalty determination under the Eighth and Fourteenth Amendments.

█ A juror may be excused for cause based on his or her views concerning capital punishment only if they would prevent or substantially impair the performance of the duties defined by the trial court's instructions and the juror's oath. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 85 [108 S.Ct. 2273, 2276-2277, 101 L.Ed.2d 80] [speaking of the due process clause of the Fourteenth Amendment].) As a general matter, " 'the determinant is "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror*." ' [Citation.] If the prospective juror's responses to voir dire questions are conflicting or equivocal, the trial court's determination of the juror's true state of mind is binding upon the reviewing court." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1318-1319 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

On *Hovey* voir dire (*Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]), the trial court granted the prosecution's challenges to excuse Prospective Jurors Marie B., Fidela C., and Bertram E. for cause.

When the trial court asked Marie B. if she would vote against a first degree murder verdict or find false a special circumstance allegation "just to avoid the penalty issue," she stated, "I would have to avoid the penalty issue. I do not believe in capital punishment and the death penalty." In response to another question, she stated that it would be "difficult" to impose the death penalty no matter what evidence was presented.

On examination by counsel for defendant, Marie B. retreated somewhat from the implications of her initial comments, or gave answers inconsistent with them. She clarified that she could find defendant guilty or not guilty despite her opposition to the death penalty. Still, she found the punishment "barbaric" and she "could not impose it." In response to another question, however, she stated that she could put aside her feelings and follow the court's instructions, even if she did not "believe I could be in favor of anyone getting the death penalty."

But on further examination by the prosecutor, Marie B. agreed that the prosecution would be "wasting its time," in the prosecutor's words, to ask her to return a verdict of death.

The trial court ruled in essence that Marie B.'s opposition to the death penalty either substantially impaired or entirely negated her ability to follow her oath as a juror.

Fidela C. also stated, in answer to the trial court's question, that it would be difficult to impose the death penalty no matter what evidence was presented. On examination by counsel for defendant, the prospective juror wavered. She answered essentially in the affirmative leading questions about her ability to follow her oath. But then she volunteered that she did not "want to be part of a jury if it comes to a death penalty or life in prison," "because it is going to be in my conscience. I don't want to be the one who decides" on life or death. Counsel reverted to leading questions, and Fidela C. stated that she thought she could follow the law.

Examined by the prosecutor, Fidela C. gave inconsistent answers. She denied being in the group of people who would be so preoccupied with the question of penalty that she could not consider defendant's guilt or the truth of the special circumstance allegations. This answer came in answer to a

compound question that asked her, in part, whether she could not sit on a death penalty case because she opposed the penalty. The nature of the question left her response ambiguous. In the next question, the prosecutor asked directly whether Fidela C. would "want to decide" on life or death, and she said no, because she opposed capital punishment. But asked whether that feeling would make it "very difficult for you to return a verdict of death, no matter what you heard," she responded, "I don't know. I don't really know now."

The prosecutor continued. She asked her own series of leading questions, which generated equivocal answers. Defense counsel asked more questions, receiving more equivocal answers; the trial court could not hear one of them.

Finally, the trial court asked Fidela C., "are you indicating . . . that assuming that you are at the penalty phase and assuming that in your heart you felt that death was the appropriate penalty, would you be able to come into court and voice a vote for the death penalty? Would you be able to do that?" She answered, "I don't think so, your Honor."

After hearing argument from both parties, the trial court ruled that Fidela C. would be excused for cause. "It is painfully clear," the court explained, "that the notion of a death penalty verdict is something that she would be incapable of doing even if the evidence justifies that in her mind. . . . Her whole demeanor was one of trepidation, fear, and indeed extreme emotional pain just at the thought of being included on this particular jury. [¶] I think it is also clear . . . just during the first phase of the trial that she would be substantially impaired because of a preoccupation with maybe having to deal with the issue of the death penalty, that she could not be fair to the facts or the parties."

Bertram E., who had served on approximately three juries, answered the court's questions by stating that he did not "believe in the death penalty . . . . [¶] . . . [¶] [u]nder certain circumstances," and that he "would be prepared to say the person isn't guilty. I kind of feel the death penalty hasn't proved anything heretofore as far as being a deterrent to murder."

Questioned by counsel for defendant, Bertram E. retreated, stating that he could follow an instruction to consider guilt without contemplating punishment.

Bertram E. also stated that he was not automatically opposed to the death penalty. He could impose it in cases involving airplane hijacking with hostages or the sale of large amounts of narcotic drugs. With regard to

murder *simpliciter*, he stated, "we have murdered other people because they murdered somebody. That hasn't deterred it in the past. . . . I don't think it will deter [murder] in the future. Consequently, I don't think that it's effective." He also stated that if he were punished for murder, he would prefer execution to life imprisonment.

Informed by defense counsel that the case involved allegations of the sale of narcotics, and over the prosecution's objection that she was asking the prospective juror to prejudge the case (an objection that the trial court later agreed was proper, but overruled anyway so as to obtain the most information possible), Bertram E. said that "you can't kill a person for having a few marijuana cigarettes in his pocket. But if he had a couple hundred thousand . . . marijuana cigarettes in his possession, he's affecting that many people, cocaine, or heroin, or whatever. Then I would come down much harder on that person . . . ." Thus, he agreed in response to counsel's words, which are quoted in this sentence, that the involvement of a large quantity of drugs would be a "factor" that could lead him to impose "a more severe punishment."

The prosecutor then questioned Bertram E. He asked him again whether he would avoid convicting defendant of a crime or finding true a special circumstance allegation that would make him death eligible. Bertram E. hesitated, then said, "I would have to say my answer is yes on that." The prosecutor pointed out that the case was a murder case, not a drugs or hijacking case, and Bertram E. acknowledged that under that circumstance he would only vote for life imprisonment, even if he was able to consider the presence of drugs as a circumstance of the crimes during the penalty phase. Counsel then argued whether Bertram E. should be excused for cause. Defendant's counsel agreed that his answers were in "clear conflict" and "equivocal."

The trial court ruled that Bertram E. was "very clear that he . . . would not consider the death penalty" "for a triple homicide." It ruled that the prospective juror did not have "an open mind," and that his ability to follow the law was "substantially impaired."

In excusing the prospective jurors for cause, the trial court ruled that they could not impose the death penalty against defendant even if they thought the evidence merited it. That determination of their state of mind is binding on us. State law required the court to excuse them, for they acknowledged their inability "to act with the 'entire impartiality' required of jurors." (*People v. Balderas* (1985) 41 Cal.3d 144, 183 [222 Cal.Rptr. 184, 711 P.2d 480]; see now Code Civ. Proc., § 225, subd. (b)(1)(C) [same].) There was no

constitutional impediment to the exercise of state law, for their ability to perform their duties was at least substantially impaired—in fact their views prevented them from following the law. The court did not deprive defendant of due process or violate any other constitutional guaranty by excusing the prospective jurors.

## V. *Failing to Excuse Jurors for Cause*

 Next, defendant contends that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution were violated by rulings that a number of prospective jurors need not be excused for cause.

In defendant's view, the prospective jurors were predisposed in favor of the death penalty without sufficient regard for the legal standards to be applied to facts that might eventually be presented—in other words, they could not be impartial as to penalty—and should have been excused for cause.

Defendant concedes that he did not use all of his peremptory challenges. Accordingly, he has waived his claim that the prospective jurors should have been excused for cause. (*People v. Osband* (1996) 13 Cal.4th 622, 670 [55 Cal.Rptr.2d 26, 919 P.2d 640]; see also *United States v. Martinez-Salazar* (2000) 528 U.S. 304, 313-314 [120 S.Ct. 774, 780-781, 145 L.Ed.2d 792, 801-802].) He now claims perfunctorily that he was dissatisfied with the jury, but this "belated recitation" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1211 [14 Cal.Rptr.2d 702, 842 P.2d 1]), though understandable given his death sentence, is insufficient (*ibid.*). "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so." (*People v. Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Defendant did not fulfill these requirements. Rather, he told the trial court that he was satisfied with the jury as constituted, even though it included a juror whom he had previously challenged for cause.

Defendant also urges that he has justified his failure to express dissatisfaction with the jury as constituted because the trial court used the "struck jury" selection system rather than the "jury box" method. He asserts that he challenged approximately 30 jurors for cause because of their attitude toward either the death penalty or him, that most of those challenges were rejected, that the number of peremptory challenges remaining when he indicated satisfaction with the jury was insufficient to purge the prospective

jurors he had challenged for cause, and therefore exhausting his "remaining eleven peremptories would result in an equally, if not more, unfavorable jury." But we have previously rejected the argument that the struck-jury system permits exceptions to the exhaustion rule (*People v. Johnson, supra,* 3 Cal.4th 1183, 1211), and we decline to reexamine our reasoning (accord, *People v. Osband, supra,* 13 Cal.4th 622, 670). Even if defendant had not explicitly said that he was satisfied with the jury, we would not be persuaded by his argument. As we stated in *Johnson*: " 'Regardless of the system of jury selection, a party's failure to exercise available peremptory challenges indicates relative satisfaction with the unchallenged jurors. Having so indicated in this case, defendant cannot reasonably claim error.' " (*Johnson,* at pp. 1211-1212.)

In any event, the jury's composition did not prejudice defendant in any way. The parties agree that only one seated juror, James C., was the subject of a challenge for cause by defendant. Our review of James C.'s *Hovey* voir dire testimony satisfies us that the trial court properly denied the challenge. James C. initially testified that he favored imposing the death penalty in 80 percent of murder cases, though "if there were mitigating circumstances, I would take them into [account] and weigh them." And he agreed that the death penalty was, in counsel's words, "justified" in the abstract for the killings of three people execution style. But he also testified that he would follow instructions to impose life imprisonment if he found that the mitigating and aggravating evidence was in balance, and to impose the death penalty only if he found that the aggravating evidence substantially outweighed the mitigating. He further testified that he would be receptive to mitigating evidence at the penalty phase even if defendant had been convicted of three execution-style murders. Following defendant's challenge for cause, the trial court ruled that James C.'s views on the death penalty did not substantially impair his ability to follow his oath as a juror. The ruling was proper.

### VI. *Denying Motions for Polygraph and Medical Examinations*

Defendant filed motions to conduct a polygraph examination and psychiatric and neurological examinations of Castillo. The basis for the first was Castillo's purported lack of credibility, and for the other two his purported incompetence to testify.

The trial court denied both motions.

#### 1. *Polygraph Examination*

 In seeking to have Castillo tested by polygraph, defendant relied on constitutional guaranties of due process, the federal constitutional prohibition of cruel and unusual punishments, the California constitutional guaranty

against cruel or unusual punishments, and the right to heightened reliability in the factfinding aspects of a capital case. At a hearing on the motion, counsel for defendant explained, "we're not saying that the case should be dismissed, but rather that the special circumstances which Pedro Castillo— which his testimony is the underpinning for, should be stricken, in the absence of every legitimate effort on the part of the prosecution . . . to determine whether or not Pedro Castillo is telling the truth . . . ." The trial court ruled, however, that "there is not either authority[,] nor acceptance in the scientific community, with reference to the polygraph, [and] for those reasons, the motion will be denied." We agree that defendant was not entitled to have the court compel a polygraph examination of Castillo.

Defendant acknowledged that he could not admit in evidence the result of a polygraph test (Evid. Code, § 351.1), but he asserted that a test was justified anyway. "Based on the inconsistencies in his [preliminary hearing] testimony and statements to the police, there is a strong probability that Pedro Castillo in some or all respects will not pass a polygraph examination. His failure to do so is a fact that should at least be . . . considered by the prosecution in deciding whether to proceed with the special circumstances against these defendants [defendant and Hector Ayala, who joined defendant in the motions]. Also, the defendants are entitled to have the court consider favorable [*sic*] polygraph results in deciding whether or not to grant a Penal Code section 1385 motion to dismiss the special circumstances and in reviewing a finding imposing the death penalty pursuant to Penal Code section 190.4(e)."

The use of the results of a psychological examination to impeach a witness's credibility is, in the main, disfavored. (See *People v. Marshall* (1996) 13 Cal.4th 799, 835 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Evidence Code section 351.1 provides: "(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results. [¶] (b) Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible."

It is implicit in Evidence Code section 351.1 that a trial court may not compel a polygraph examination. It would be an idle act, which "[t]he law neither does nor requires." (Civ. Code, § 3532.) The statute provides that the

result of a polygraph examination is without evidentiary effect. It would probably be improper for a trial court to take into consideration, in ruling on a motion to dismiss an action under section 1385, or in ruling on an automatic motion to modify a verdict of death (§ 190.4, subd. (e)), results from a technique that the Legislature has disfavored. We need not decide that question—it suffices to note here that state law certainly does not require a court to compel a polygraph examination.

Defendant relied, however, on constitutional notions of due process. He may be understood to assert that because Evidence Code section 351.1 bars the admission of reliable impeachment evidence, or at least the discovery of facts that might lead to impeachment evidence, it violates the due process clauses of the federal and California Constitutions. But we have held that before a criminal defendant can establish a right under state law or as a matter of due process to use the results of a polygraph examination, it is necessary (we expressed no opinion on whether it would suffice) to offer proof that the technique has become generally accepted in the scientific community. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1212 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) The same requirement applies to any right to obtain a polygraph examination for possible use. Defendant undertook no effort here to show that polygraph examinations have been generally accepted by scientists in the relevant field.

### 2. *Psychiatric and Neurological Examinations*

■ Defendant's motion to compel the psychiatric and neurological examinations was based on state law, in particular Evidence Code section 730, which provides in relevant part that the trial court, if it thinks an expert evaluation is required, "may appoint one or more experts to investigate . . . the fact or matter as to which the expert evidence is or may be required." His appeal is also based on state law grounds. At trial, he argued that such tests were justified in order to ascertain whether Castillo was competent to testify. "Whether his testimony is the result of his own genuine memory or the result of pressures and suggestions that were brought to bear upon him at a time when he was injured, in a 'fog,' and chemically dependent must be resolved . . . prior to his testimony." Defendant made clear that he wanted to use any adverse test results for impeachment.

The trial court denied the motion without comment.

There was no error. Evidence Code section 700 provides: "Except as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter."

Subdivision (a) of section 701 of the Evidence Code provides in turn: "A person is disqualified to be a witness if he or she is: [¶] (1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him [or her]; or [¶] (2) Incapable of understanding the duty of a witness to tell the truth." Defendant bore the burden of showing Castillo's incompetence. (*People v. Cudjo* (1993) 6 Cal.4th 585, 621-622 [25 Cal.Rptr.2d 390, 863 P.2d 635].) He failed to meet that burden. The trial court could even have ruled after Castillo's direct examination. (Evid. Code, § 701, subd. (b).) By that time, however, it was apparently evident that he was competent to testify. The court did not err in denying defendant's motion for psychological and neurological examinations.

VII. *Denying Sanctions Motions Based on Castillo's Purported Perjury*

■ Defendant moved the trial court "for an order enjoining any further prosecution of the instant matter. Said motion is made on the grounds that: [¶] (1) The prosecution of Defendant[] under the information presently filed against them is based solely on the testimony of Pedro Castillo; [¶] (2) On the basis of . . . the preliminary examination in this case . . . , good cause exists to believe Pedro Castillo has committed, and will continue to commit, material perjury." As authority for the motion, defendant asserted "a right not to be placed in jeopardy of the death penalty by perjurious testimony," a right located, in his view, in the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 15 and 17 of the California Constitution.

Elsewhere in the motion, defendant argued in essence that either the prosecution must prove the reliability and credibility of Castillo's testimony via "an evidentiary presentation of its investigative efforts" at a hearing, or the case, or at least the special circumstances, must be "enjoined," stricken, or dismissed.

At a hearing on his motion, defendant objected that the police had never questioned Castillo about his involvement with narcotics, even though they knew from the outset that this was a drug-related case. Without abandoning the forms of relief he had sought in his written papers, he asked the trial court to consider his motion, in the alternative, as one to dismiss the information under section 995. The People argued that there was no authority for the motion and that Castillo's purported perjury was tangential to the question whether defendant and Hector Ayala had committed murder.

The trial court interpreted defendant's motion as one to order the prosecution or the police to investigate items of evidence. It ruled that it lacked authority to do so, and denied the motion.

Defendant ·cites no pertinent authority in support of his motion, and our own research has not disclosed any either. "The impartiality of the trial court in affording the litigants a fair trial is buttressed by the realization that at the fact-finding stage of the proceeding the court possesses no investigatory or inquisitorial function." (*Matter of Smith* (1986) 133 Misc.2d 1115, 1116 [509 N.Y.S.2d 962, 963].) Moreover, "the District Attorney [is] entitled to a strong presumption of legitimacy of [its] role." (*People v. Doe* (1990) 148 Misc.2d 286, 291 [560 N.Y.S.2d 177, 181].)

We agree with principles stated by the Arkansas Supreme Court, which rejected a claim similar to defendant's. In *State v. Pulaski County Circuit Court* (1994) 316 Ark. 514 [872 S.W.2d 414] (*per curiam*), the state sought a writ of prohibition against a trial court order directing the prosecutor to perform scientific tests on samples taken from three defendants charged with rape. The Arkansas Supreme Court held that "the circuit court lacked the authority to direct the prosecutor as to what scientific tests to perform in its investigation and trial preparation. A circuit court may not perform the duties of the prosecuting attorney. [Citation.] We have held in this regard that the powers given to a prosecutor to charge the accused are guarded by the doctrine of separation of powers. [Citation.] [¶] Moreover, the United States Supreme Court has determined that the defendant's right to a fair trial as embraced within the Due Process Clause is not violated 'when the police fail to use a particular investigatory tool.' [Citation.]" (*Id.* at p. 516 [872 S.W.2d at p. 415].)

Without making any judgment on the applicability of the Arkansas Supreme Court's reasoning to scientific-testing requirements in this state, we agree with its description of limitations on a trial court's authority in general to compel prosecutorial investigative action. The trial court herein committed no error under California law, whether constitutional, decisional, or statutory, nor was there any violation of the federal Constitution.

VIII. *Denying Motion to Introduce Statements of Deceased Persons*

■ The question presented in this claim is whether defendant had either a constitutional or a state law right to present exculpatory but unreliable hearsay evidence that is not admissible under any statutory exception to the hearsay rule. We hold that he did not.

Defendant moved to introduce the hearsay statements of two individuals who were interviewed by his investigators but who died before they could appear at trial. The trial court denied the motion on grounds that he sought to introduce inadmissible hearsay evidence, and that some of the evidence was

cumulative. He claims that this ruling violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and under state law.

Defendant's moving papers explained that he wished to have Bill Papenhausen and Carlos Vasquez, both licensed private investigators, testify about statements made to them respectively by Arthur Stephen Castro and Ignacio Vejar Nogales (Vejar), before they died. He stated that Castro's and Vejar's statements were "critical to the defense in establishing his innocence of the crimes charged." Citing *Chambers v. Mississippi* (1973) 410 U.S. 284 [93 S.Ct. 1038, 35 L.Ed.2d 297], he argued that even if state law prohibited the testimony, due process required the trial court to let him present it.

He also claimed in his motion that had the prosecution not improperly delayed its filing of notice of uncharged incidents in aggravation (§ 190.3) for almost two years, Castro and Vejar would have been alive and available to testify. He asserted that the prejudice caused by this delay could only be remedied by permitting him to have Papenhausen and Vasquez testify about the content of the decedents' statements. He attached death certificates showing that Castro died April 15, 1988, and Vejar died September 5, 1988.

The two investigators filed affidavits describing what the decedents told them. According to Papenhausen's affidavit, he interviewed Castro in state prison. Castro told him he went to the body shop to buy heroin the day before the killings, and found Dominguez arguing in Spanish with three men about a large sum of money. They ignored him (Castro was of the view that they did not realize he understood Spanish) and he went across the street to buy a beer. When he returned, he saw the visitors driving away in a car with Mexican license plates. Castro could tell that all three were Mexican residents. Castro concluded that they represented Dominguez's heroin connection and that Dominguez was in trouble with them.

Vejar, interviewed by Vasquez at Vejar's mother's house in Tijuana on August 24, 1988, related a version of events that varied markedly from others' accounts of the killings.

According to Vasquez's affidavit, Vejar went to 999 South Forty-third Street on the day of the killings to pick up his brother. While waiting for him, he heard a shot and saw Castillo run into the street and collapse. Ten to fifteen minutes later, the police, who had arrived in the interim, and Vejar took Castillo to a patrol car. Vejar asked Castillo what had happened, and Castillo said he did not want to talk about it. After placing Castillo in the car, Vejar and the police heard three shots come from the direction of the body

shop. Vejar suggested that the police open the garage door. The police acted "scared," but one officer went with Vejar to open it. More police officers arrived, and they pulled Vejar away.

In denying defendant's motion to introduce the statements, the trial court implied that they could be introduced if they showed aspects of "trustworthiness, or other indicia of reliability." But it found that they did not have such indicia. The court also concluded that other witnesses had already provided evidence that Castillo did not want to discuss events immediately after being shot and stabbed, and so Vejar's statement would be cumulative in that regard.

Evidence Code section 1200, subdivision (b) provides that "Except as provided by law, hearsay evidence is inadmissible," and the parties do not point to any provision of the Evidence Code that would provide an exception to the hearsay rule for the purported witness statements. But " '[l]aw' includes . . . decisional law" (Evid. Code, § 160), and California decisional law includes our own comment that "exceptions to the hearsay rule are not limited to those enumerated in the Evidence Code; they may also be found in . . . decisional law" (*In re Malinda S.* (1990) 51 Cal.3d 368, 376 [272 Cal.Rptr. 787, 795 P.2d 1244]), and our affirmation of that principle in *In re Cindy L.* (1997) 17 Cal.4th 15, 26 [69 Cal.Rptr.2d 803, 947 P.2d 1340].

Nevertheless, defendant cites no law of this state, whether "constitutional, statutory, [or] decisional" (Evid. Code, § 160), that would have required the trial court to permit the investigators to testify about Castro's and Vejar's statements. He relies on *In re Carmen O.* (1994) 28 Cal.App.4th 908 [33 Cal.Rptr.2d 848]. *Carmen O.* applied the rule that the appellate courts of this state may recognize exceptions to the hearsay rule beyond those listed in the Evidence Code. It created an exception for the out-of-court statement of four-year-old Carmen O. that her father had sexually abused her.

In *In re Cindy L.*, *supra*, 17 Cal.4th 15, we approved *Carmen O.*'s creation of a judicially announced exception to the hearsay rule, and refined the rule ourselves. But we warned that "in developing new exceptions to the hearsay rule, courts must proceed with caution. The general rule that hearsay evidence is inadmissible because it is inherently unreliable is of venerable common law pedigree." (*Id.* at p. 27.) And we stated that appellate courts "may not create evidentiary exceptions in conflict with statute." (*Id.* at p. 28.) We approved of the exception announced in *Carmen O.* because it was needed to effectively prosecute child sexual abuse cases with reticent, very young direct witnesses. (See also *In re Lucero L.* (2000) 22 Cal.4th 1227, 1238-1239 [96 Cal.Rptr.2d 56, 998 P.2d 1019] (plur. opn.).)

There is, by contrast, no proper exception to the hearsay rule that would have permitted defendant to introduce Castro's and Vejar's statements. There are no indicia of reliability surrounding those statements even remotely similar to those that have justified the exception for certain hearsay statements of very young children. Via cross-examination or further investigation the prosecutors might have discovered evidence, for example, that defendant had coerced Castro and Vejar into making them, just as they had introduced evidence that he induced Rafael Mendoza Lopez to perjure himself regarding the presence of Mexican men at the body shop on the day of the murders. Indeed, that part of Castro's statement referring to Mexican visitors buttressed aspects of Mendoza's initial testimony, which Mendoza himself later repudiated as having been fabricated at defendant's behest. Moreover, on cross-examination the prosecution could have questioned Castro about why Dominguez and the Mexican visitors would continue to discuss large sums of money in front of a total stranger, particularly if it involved sales of heroin, and about the basis for his view that they thought he could not understand Spanish. There was no state law error.

Defendant urges, as noted, that the trial court infringed on various constitutional guaranties when it barred the jury from hearing potentially exculpatory evidence. But it did not. "Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi, supra*, 410 U.S. 284, 302 [93 S.Ct. 1038, 1049].) Thus, "[a] defendant does not have a constitutional right to the admission of unreliable hearsay statements." (*Com. v. Piper* (1997) 426 Mass. 8, 11 [686 N.E.2d 191, 194]; accord, *People v. Fudge* (1994) 7 Cal.4th 1075, 1123 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Moreover, both we (*People v. Hawthorne* (1992) 4 Cal.4th 43, 56 [14 Cal.Rptr.2d 133, 841 P.2d 118]) and the United States Supreme Court (*United States v. Scheffer* (1998) 523 U.S. 303, 316 [118 S.Ct. 1261, 1268; 140 L.Ed.2d 413]) have explained that *Chambers* is closely tied to the facts and the Mississippi evidence law that it considered. *Chambers* is not authority for the result defendant urges here.

The foregoing principles were applied to a case with facts similar to the matter herein in *State v. Bunyan* (1998) 154 N.J. 261 [712 A.2d 1091].) In *Bunyan*, the defendant, convicted of murder, had sought to introduce the exculpatory hearsay statement of a witness who later died. The witness, shown a photograph of Bunyan out of court, told an investigator that he was not the killer. The witness refused to execute a written statement before dying. Moving for a new trial, Bunyan sought to introduce the investigator's affidavit memorializing his conversation with the witness.

The New Jersey Supreme Court held that the statement was inadmissible hearsay under state law, and that relevant provisions of the federal Constitution (it emphasized the right to a fair trial) did not compel its consideration. "There is no 'particularized guarantee[] of [its] trustworthiness.' [Citation.] Her statement was not against her interests. She made it years after the crime occurred. After making her statement to a private investigator, [she] immediately threatened to disavow it. Additionally, . . . there will be no opportunity to cross-examine [her; she] is now deceased. And [her] statement . . . was not spontaneous. On the contrary, she gave it in response to questions posed by a private investigator defendant hired." (*State v. Bunyan, supra*, 154 N.J. 261, 271 [712 A.2d 1091, 1095-1096].)

Not all of these factors apply to the statements of Castro and Vejar. Castro's statement may have been against his interest: he was admitting that he had gone to the body shop to buy heroin; but on the other hand, Papenhausen interviewed him in prison and double jeopardy might have barred any prosecution for Castro's act. As far as is known, neither witness disavowed his statement after making it; indeed, Papenhausen's affidavit declared that Castro later reaffirmed his statement. Nevertheless, other factors mentioned in *Bunyan* are significant: the statements were given to a person seeking exculpatory evidence, they were not spontaneous, and there was no opportunity for cross-examination. California has an interest "in ensuring that reliable evidence is presented to the trier of fact in a criminal trial." (*United States v. Scheffer, supra*, 523 U.S. 303, 309 [118 S.Ct. 1261, 1268].) Given the potential unreliability of Castro's and Vejar's statements and the evidence of defendant's attempt to supply false evidence to the jury that bore a similarity to Castro's statement, we are unable to discern any constitutional violation in the trial court's refusal to admit the investigators' accounts of those statements.

Defendant also renews a claim that improper delays in bringing his case to trial caused the delay that in turn caused Castro and Vejar to become unavailable because of death. His claim is perfunctory, and he does not cite any statute, rule, or legal tenet that the prosecution may have violated. The claim is without merit.

### IX. *Denying Motion to Exclude Certain Testimony of Meza*

Defendant claims that the trial court violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution when it failed to give him an adequate opportunity to try to prove, in an in limine hearing at which Juan Manuel Meza testified, that the People coerced the testimony Meza gave against him at trial. He argues that this court should

either reverse his convictions or order a new hearing on the issue of the voluntariness of Meza's testimony. But the record shows that he was able to question Meza about whether he had been coerced, and he denied that he had been.

In *People v. Badgett, supra,* 10 Cal.4th 330, 351, we stated that "if the issue is not litigated below because the defendant has been precluded by an erroneous ruling on standing from attempting to carry his burden of demonstrating that third party testimony is coerced, there will not be an adequate record for the appellate court to review." Defendant asserts that this error occurred in his case. But the record shows that the trial court gave him sufficient opportunity to show that Meza's testimony was coerced. Defense counsel was unable to establish any coercion in her examination of Meza, and in fact she established the opposite. The factual predicate of defendant's claim of constitutional error is faulty, and so the claim itself is unavailing.

Defendant also claims that the trial court erred by ruling that he could not impeach Meza with evidence that he had once lied to a probation officer about owning a gun. We agree with defendant that the court erred in ruling that the gun evidence was inadmissible character evidence. It was evidence of dishonesty with which Meza could have been impeached. But we discern no prejudice: applying the reasonable probability test of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*People v. Cudjo, supra,* 6 Cal.4th 585, 611-612), we find no such probability that had Meza been impeached with that evidence of dishonesty the outcome would have differed. Defendant also claims that the court erroneously excluded other impeachment evidence consisting of instances of Meza's misconduct. But we read the court's ruling on that point as excluding for impeachment, under Evidence Code section 352, instances of bad conduct that did not involve dishonesty or other moral turpitude. On this record, we find no abuse of discretion.

### X. *Choosing Not to Present Richard Savocchio's Testimony*

Defendant claims that he received ineffective assistance of counsel and his due process rights were violated when, following counsel's decision not to present it, the jury did not hear testimony from Richard Ortiz Savocchio.

According to an offer of proof by defendant, Savocchio had known Juan Manuel Meza since the 1970's and at one time was distantly related to him by marriage. The two encountered each other in prison about 1987 or the early part of 1988, and had a conversation about defendant's case. Defense counsel described the purported exchange. "Out of curiosity, [Savocchio]

said, 'Hey, you know, is it true, are you testifying in a case?' And Meza said to him . . . 'that ain't nothing,' and Savocchio asked Mr. Meza what he meant, and Mr. Meza said, 'These guys are going down anyhow, and I'm going to get something out of it. . . . I don't know anything about it, [but] they are going anyways.' [¶] Mr. Savocchio understood the meaning of the conversation to be that Mr. Meza was cutting a deal for himself to testify in the case about which he knew nothing[;] and that was essentially the extent of the conversation."

At an in limine hearing to determine the extent to which he could be impeached before the jury, Savocchio testified that he had served five terms in prison. For the balance of his final term, he requested to be placed in protective custody. He explained, "I had twelve years to do, and I was sent to Folsom [State Prison], and they were all in lockdown, so I made up a story just to get out of there." He created a tale that he was in trouble with the Mexican Mafia, which was a prominent gang at Folsom, over a drug deal. In fact he was not. Savocchio denied knowing defendant, Hector Ayala, or Moreno, or knowing anything about defendant's case. He did know of Meza, and he may have heard that Meza was a former or would-be member of the Mexican Mafia.

The prosecution called parts of Savocchio's in limine testimony unbeliev-able, and argued that it was entitled to impeach him before the jury with his admission that he had lied for years about gang membership in order to be transferred from Folsom prison. In response, defendant argued that if the prosecution were permitted to do so, the mention of the Mexican Mafia would cause the jury to believe that he belonged to the gang. He argued that the impeachment evidence would either be irrelevant or substantially more prejudicial than probative.

But the trial court ruled that Savocchio could be impeached on cross-examination with questions about the dishonesty he had admitted to in the hearing. Following that decision, defendant chose not to call Savocchio to testify. He asserts that the ruling was erroneous under state law and denied him a constitutional right to present a defense. The People respond that the ruling is unreviewable and that in any event there was no error or constitu-tional violation.

We turn to the People's procedural argument first. ▮ It is settled that "if a defendant wishes to preserve for appeal an objection to a trial court's *in limine* ruling permitting impeachment by a prior conviction, he or she must take the witness stand and actually suffer such impeachment." (*People v. Sims* (1993) 5 Cal.4th 405, 454 [20 Cal.Rptr.2d 537, 853 P.2d 992]; accord,

*People v. Collins* (1986) 42 Cal.3d 378, 383 [228 Cal.Rptr. 899, 722 P.2d 173] (lead opn.).) The People argue that this rule should be extended to all defense witnesses in a criminal trial, and to the kind of misconduct Savocchio engaged in. In their view, because Savocchio did not testify, defendant cannot raise the question on appeal.

In response, defendant maintains that the reasons for the *Collins* rule are absent here. That is true of one of them. As described in *Sims* and in *Collins*, permitting an appeal in such circumstances would require a reviewing court to consider the unknowable—i.e., the nature and effect of testimony that was never offered. (*People v. Sims, supra,* 5 Cal.4th 405, 454; *People v. Collins, supra,* 42 Cal.3d 378, 384-385.) In this case, Savocchio testified in limine, and his testimony is available to us. There is another reason for the *Collins* rule, however, and it applies here: "the reviewing court . . . has no way of knowing whether the prosecution would . . . have used the [evidence of dishonesty] to impeach." (*Collins, supra,* 42 Cal.3d at p. 384.)

"Because the question whether defendant has preserved his right to raise this issue on appeal is close and difficult, we assume he has preserved his right, and proceed to the merits. We have done the same in similar situations in the past." (*People v. Bruner* (1995) 9 Cal.4th 1178, 1183, fn. 5 [40 Cal.Rptr.2d 534, 892 P.2d 1277].)

 First, defendant claims that the impeachment testimony would have been substantially more prejudicial than probative, and that the court erred in rejecting that claim at trial.

In ruling on the question whether evidence is substantially more prejudicial than probative, the trial court enjoyed broad discretion. (Evid. Code, § 352.) The prosecution was entitled to impeach Savocchio with evidence of his admitted dishonest representations to prison officials. "The voters have expressly removed most statutory restrictions on the admission of relevant credibility evidence in criminal cases . . . . Hence, they have decreed at the least that in proper cases, nonfelony conduct involving moral turpitude should be admissible to impeach a criminal witness." (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 [14 Cal.Rptr.2d 418, 841 P.2d 938]; *id.* at p. 296 [applying rule to misdemeanor conviction involving moral turpitude].) *Wheeler* is not limited to prior misdemeanors involving moral turpitude. (*Id.* at pp. 296-297 & fn. 7 [rule also applies to other conduct].) "Whether the trial court admits evidence of past misconduct should be determined solely on the basis that that conduct evinces moral turpitude. The label is not important [i.e., what type of statutorily defined offense, if any, the conduct constitutes]—the conduct is." (*People v. Lepolo* (1997) 55 Cal.App.4th 85, 89-90 [63 Cal.Rptr.2d 735].)

Defendant asserts that courts must be exceptionally careful in admitting evidence, including for impeachment, of gang membership. As stated, he also urges that the jury, having heard Savocchio's testimony, would have associated him, defendant, with the Mexican Mafia. But Savocchio would have been impeached, if at all, with evidence that he was *not* in a prison gang. He would have been impeached solely with evidence that he lied about belonging to such a gang. We fail to discern how that would link defendant with the Mexican Mafia in the jurors' minds.

Defendant next urges that the trial court's ruling denied him a constitutional right to present his defense to the charges. But he chose not to present the testimony that he claimed Savocchio would give. He has waived any such claim.

Anticipating our conclusion in that regard, defendant, as mentioned, claims that counsel's decision not to present Savocchio's testimony constituted ineffective assistance of counsel.

■ As we have stated in many criminal cases, "a defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

■ Defendant acknowledges that counsel's initial decision not to present Savocchio's testimony was reasonable. Indeed, he must concede that point, as he argues in this court that the decision was necessary to keep the jury from hearing any mention of the Mexican Mafia. But he asserts that once the prosecution, in its rebuttal case, had presented Rafael Mendoza Lopez's recantation, the jury had to be aware of his connection to the Mexican Mafia, and no harm would have resulted from Savocchio's testimony.

On this record, we discern no deficient performance by counsel. Before Mendoza testified on rebuttal, the parties and the trial court discussed at length how to have him tailor his testimony to avoid any mention of prison gangs, specifically the Mexican Mafia. The parties agreed that Mendoza would refer to "groups," and so he did when he testified, using that or other euphemisms such as "people." Nothing in this record shows that it would have been wishful thinking for counsel to believe that the jurors would not understood "group" or "people" to refer to the Mexican Mafia or any other prison gang. Of course, a particularly knowledgeable juror might have

guessed that some or all of the euphemisms referred to prison gangs,[4] but we cannot say that counsel was unreasonable in believing she had kept the inflammatory subject from the jury. Indeed, it was probably a wise choice for the defense to avoid jeopardizing its victory regarding mentions of gangs. There was no ineffective assistance of counsel.

In sum, we conclude that defendant's claim is without merit.

### XI. *Propriety of Mendoza's Rebuttal Evidence*

Defendant claims that his rights under state law and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the jury heard Rafael Mendoza Lopez's testimony on rebuttal. In essence, though, this is a claim under state law that Mendoza's recantation constituted improper rebuttal evidence.

The People argue that defendant did not object at trial to Mendoza's impending testimony on the ground that it would be improper rebuttal. They contend that he has failed to preserve his claim. But the record shows that defense counsel told the trial court that any testimony by Mendoza was improper rebuttal. We shall proceed to address the claim on its merits.

Doing so, however, we find it meritless. Far from being improper, Mendoza's testimony was, in respect of its evidentiary effect and importance, the ideal rebuttal: the witness repudiated his own testimony. Moreover, as the People observed at oral argument, it was among the most justifiable of all rebuttals, because it could not have been presented during the prosecution's or even the defense's case-in-chief. There was no error under state law in admitting the evidence. Because defendant's constitutional claims are predicated on that claim, and no error occurred, we find no constitutional violation. Moreover, to the extent defendant argues that the trial court should have screened Mendoza's proposed rebuttal testimony so as to decide its reliability in limine, he failed to seek such clearance from the court in any meaningful way, notwithstanding his fleeting reference to the admissibility of the testimony, and he has failed to preserve the claim for review.

Defendant also contends that the trial court erred in failing to give him an adequate continuance to investigate Mendoza's impending recantation.

---

[4]For example, there were references to a "southern group" and a "northern group" of inmates, and a particularly knowledgeable juror might speculate that these were references to Sureño and Norteño factions of inmates (see *People v. Valdez* (1997) 58 Cal.App.4th 494, 499, fn. 2 [68 Cal.Rptr.2d 135]), which the juror might think of as gangs (but see *id.* at p. 508; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1156, fn. 3 [59 Cal.Rptr.2d 587] [Sureño and Norteño denote a geographically based division of Hispanic gangs, but not individual gangs per se]). Mendoza testified in essence that both he and defendant were associated with the southern group.

Though he invokes various constitutional provisions in support, in its essence this, too, is a claim of error under state law.

On Monday, September 26, 1988, the prosecution informed the trial court that Mendoza had disavowed his exculpatory testimony on the previous Friday, and that the prosecution had tape-recorded a version of the recantation on Saturday and made it available to defense counsel just as the proceedings were resuming on that Monday.

The trial court granted defendant's request for a three-day continuance, and he failed to renew it. To be sure, that Wednesday, before the continuance ended, counsel said that the defense had not yet been able to investigate or interview individuals mentioned in the tape recording Mendoza gave of his recantation. But counsel added, "I'm less concerned with the ability to cross-examine [Mendoza] tomorrow than I am with the ability to respond in terms of defense evidence." The court suggested that the defense interview the individuals mentioned in the tape over the weekend. The following Monday, the defense rested its case after calling two witnesses that offered the impeaching evidence that Mendoza could not have met with defendant in June or July of 1985 along with Rudy "Green Eyes" Ayala Ybarra (or Ibarra). (*Ante*, at p. 249.) We do not interpret the record as showing that the court denied any motion that defendant brought.

## XII. *Effect of Evidence Suggesting Gang Involvement*

■ This claim contains many subparts, presented at length, but it may be distilled to contentions that (1) the prosecution, in various ways, exploited defendant's alleged affiliation with the Mexican Mafia prison-based gang to deprive him of a sufficient defense and improperly suggest his dangerousness to the jury, (2) the trial court erred in failing to exclude various types of evidence of gang affiliation or involvement, and (3) the court's failure to set out clear rules regarding the admissibility of gang-related evidence caused defense counsel to become "gun-shy." Defendant claims that the result was a trial that violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Our interpretation of the trial transcript is quite different from defendant's.

Various witnesses against defendant feared the Mexican Mafia, and that fear at times explained their prior conduct, their motivation to testify, or their accepting government protection—items that bore on the witnesses' credibility, and thus items that they needed to explain. The trial court agreed that evidence of defendant's involvement in the Mexican Mafia would be

unduly prejudicial, thus giving itself and the parties the task of excluding inflammatory references to the gang while enabling witnesses to explain the basis for their testimony.[5] The court made diligent efforts to try to achieve this balance, ordering that witnesses refer by various euphemisms to pressures from others unless the defense opened the door to naming the Mexican Mafia.

The result was successful. We have already explored this issue at some length *ante*, at pages 271-275, in our review of issues surrounding Richard Ortiz Savocchio and Rafael Mendoza Lopez. And as alluded to in the statement of facts, the prosecution needed to explain Pedro Castillo's reticence and evasions when the police first interviewed him, and why he changed his mind and decided to denounce the murderers. So it was also with other witnesses, such as Juan Manuel Meza, who needed to explain the consideration, in the form of protection for his family, that the state was extending him.

There was no error in presenting such evidence, which affected the witnesses' credibility. And the parties and trial court succeeded in doing it without exposing the jury to testimony about the Mexican Mafia or about prison-based gangs in general—the very thing about which defendant expressed concern before and during the trial.

As a result of the trial court's efforts, the jury never heard the names Mexican Mafia or La Eme. As stated *ante*, at pages 274-275, the jurors heard only sanitized references to other people or groups that might wish to influence a witness's conduct or testimony or retaliate against the witness for harming the defense.

Assuming that defendant's reference to counsel's reticence in the face of the possibility of introducing references to the Mexican Mafia is a claim of ineffective assistance of counsel, we see none. It was a reasonable tactical choice—indeed it was, as stated, probably a wise choice—for the defense to avoid jeopardizing its victory regarding mentions of gangs.

In sum, defendant's claim is without merit. The trial court did not err, nor was any constitutional right violated.

XIII. *Issues Regarding Misdirected Phone Call from Mexico*

When Pedro Castillo was in the hospital, he received a phone call from Mexico. The caller said that she was trying to reach a Pedro Castillo,

---

[5]The court opined that any "mention of the Mexican Mafia in this trial is going to be extremely prejudicial . . . ."

whom she believed to be in that hospital. Castillo testified that the caller was trying to reach someone with the same name either in the next bed or at least on the same floor.

To challenge the veracity of Castillo's testimony and suggest his involvement with a Mexican heroin connection, the defense introduced evidence that there was no other patient named Pedro Castillo in that hospital at that time.

In rebuttal, after the trial court overruled defendant's objection of improper rebuttal and improper failure to disclose to him certain evidence regarding the phone call, the prosecution called Castillo's wife Maria, who had answered the call. Maria Castillo testified that the caller was a Benita Gonzalez, and that she was looking for her son, a different Pedro Castillo. At the telephone operator's request, she wrote down Gonzalez's name and phone number in an address book, and she gave that information to the prosecution about six months before she testified.

After Maria Castillo testified, defendant moved to bar any further rebuttal testimony on the question of the phone call from Mexico. Again the grounds for his motion were improper rebuttal and improper failure to disclose evidence regarding the phone call.[6]

The trial court denied the motions. It ruled explicitly that the prosecution had not violated its discovery orders, and also ruled implicitly that further testimony would not constitute, in a categorical sense, improper rebuttal.

The prosecution evidently gave notice that it intended to call Ernesto Castillo, the brother-in-law of Benita Gonzalez, to testify about her phone call from Mexico. In response to the trial court's request that the prosecution explain why Gonzalez herself was not testifying, it called Louis Richard Velasquez to testify at an in limine hearing about the authorities' investigation of the phone call.

The clerk's transcript shows that Velasquez, an investigator for the district attorney's office, had interviewed Benita Gonzalez by telephone call to Ciudad de Valles, San Luis Potosí State, Mexico, on November 24, 1986. He prepared a written report on the call two days later. The report said that Gonzalez was trying to call her brother-in-law, the different Pedro Castillo, who she said was elsewhere in the United States.

---

[6]At a hearing, the defense also mentioned that it was entitled to a ruling of mistrial. This assertion appeared to be an afterthought, and both the court and the parties treated it as such. Defendant does not renew this claim on appeal.

At the in limine hearing, Velasquez stated that he had recently tried to locate Gonzalez but without success, for she had left her husband and her residence in Ciudad de Valles. Velasquez reached Gonzalez's estranged husband, Plutarco Castillo, who referred him to his brother, Ernesto Castillo.

The prosecution brought Ernesto Castillo (also possibly known as Ernesto Castillo Reyna) from Mexico. He testified before the jury that he was retired from his post of Commandant of the Police of San Luis Potosí State. He confirmed that his brother Pedro Castillo was in the United States in 1985, but he did not know where. He provided a photograph of his brother Pedro, and a birth certificate showing that his brother was born in 1951 in San Ciro de Acosta, San Luis Potosí, Mexico. At closing argument, the prosecution argued without refutation from the defense that there were two Pedro Castillos, that the person in the photograph Ernesto Castillo supplied was "clearly not the same fellow" as the prosecution's witness, and that the phone call was a coincidence.

Defendant renews the claims he raised at trial: the testimony was improper rebuttal, and the prosecution violated the trial court's discovery orders in failing to alert him to Velasquez's memorialized evidence. He also claims that the failure to disclose it amounted to a violation of the due process clause of the Fourteenth Amendment to the United States Constitution.

Before trial, the trial court had ordered the prosecution to disclose "[a]ll notes or memoranda, handwritten or typed, by an investigating officer, peace officer, or deputy district attorney of their conversations with any witness which is relevant to said witnesses' credibility or upon the issues of defendants' guilt or innocence of the crimes or special circumstances charged in the complaint filed herein." The order is reasonably read as continuing in nature.

Nevertheless, we disagree with defendant that the prosecution was required to disclose Velasquez's November 26, 1986, memorandum. We turn first to his constitutional claim.

As is well known, the due process clause of the Fourteenth Amendment to the United States Constitution creates a duty in the prosecution to disclose certain evidence to a defendant. (See, e.g., *United States v. Bagley* (1985) 473 U.S. 667, 674-677 [105 S.Ct. 3375, 3379-3381, 87 L.Ed.2d 481].) The evidence, however, must be both "favorable" to the defendant and " 'material' " to either guilt or penalty. (*Id.* at p. 674 [105 S.Ct. at p. 3379].) Favorable evidence is evidence that the defense could use either to impeach the state's witnesses or to exculpate the accused. (*Id.* at p. 676 [105 S.Ct. at p. 3380].) "*Bagley* held that . . . favorable evidence is material, and

constitutional error results from its suppression . . . , 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Kyles v. Whitley* (1995) 514 U.S. 419, 433-434 [115 S.Ct. 1555, 1565, 131 L.Ed.2d 490].) A "reasonable probability" is one sufficient to "undermine[] confidence in the outcome." (*United States v. Bagley, supra,* 473 U.S. at p. 678 [105 S.Ct. at p. 3381].)

▆▆▆▆ Because there is no reasonable probability that had the evidence been disclosed to the defense the outcome would have differed, there was no due process violation. The question of the Mexican phone call was utterly ancillary to the question of defendant's guilt of three murders and to any question regarding penalty. The trial court opined that "this whole area is collateral," and we agree. Even as a distraction, it was insignificant.

We next discuss defendant's state law claim. We do not believe that the trial court's order was violated. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The entire question of the phone call from Mexico was of no consequence to the verdict in this case. To repeat: the matter was utterly collateral. We therefore reject defendant's claim.[7]

## XIV. *Denying Motion to Reopen to Show Confinement Arrangement*

▆▆▆▆ Defendant claims that the prosecution committed misconduct by permitting Rafael Mendoza Lopez and Juan Manuel Meza to be housed in the same module of a protective custody unit once Mendoza had recanted his testimony. He asserts that the prosecution, as revealed by a sheriff's department memorandum, affirmatively authorized the two to associate with each other, giving them the opportunity to confer on and align testimony adverse to him. And he claims that the trial court committed error under state law by denying his motion to reopen the guilt phase case to present evidence of the confinement arrangement. He asserts that his rights under state law were violated, as well as a right he discerns under the Sixth and Fourteenth Amendments to the United States Constitution to present a defense, and his right to a reliable determination of guilt and penalty under the Eighth and Fourteenth Amendments thereto.

The pertinent facts are these:

---

[7]He also contends perfunctorily that his right to a reliable guilt and penalty determination under the Eighth Amendment to the United States Constitution was violated. We discern no such violation, and reject that claim as well.

As mentioned, on Monday, September 26, 1988, the prosecution informed the trial court that Mendoza had recanted his exculpatory testimony on the previous Friday, and that the prosecution had tape-recorded a version of the recantation on Saturday and made it available to defense counsel just as the proceedings were resuming on that Monday. For his safety, Mendoza was moved to a protective custody module in San Diego County's South Bay district after telling the authorities he would recant. Meza was already in that module.

On October 3, 1988, the parties finished presenting their evidence and the trial court instructed the jury on the applicable law. The next day, before counsel made their arguments to the jury, defense counsel announced that because of the sheriff's failure to provide Mendoza's complete inmate housing records despite repeated requests, they did not obtain records for the current year until after they had rested their case. The 1988 records revealed that Mendoza had been housed with Meza.

In response, the prosecution stated that Mendoza's evidence had been memorialized on tape before he was moved to the same module as Meza, and that defendant had heard the tape before Mendoza testified, allowing him to cross-examine on any discrepancies whether or not he knew that Mendoza and Meza were in the same facility. (In addition, the record shows that Meza completed his testimony on the afternoon of September 7, 1988, long before being housed with Mendoza.) The prosecutor also argued that neither witness had an interest in conforming his testimony to the other's.

The prosecution explained why the two witnesses were housed together. The government needed to place both men in the South Bay protective custody module because downtown San Diego's protective custody facility was not secure enough and the El Cajon jail lacked protective custody housing. The prosecution explained the sheriff's department memorandum by stating that it needed to inform the sheriff the two men did not pose a danger to each other if they saw each other—i.e., "there will be no harm that we can perceive of that kind of a contact coming about."

In response, defense counsel argued that some of Mendoza's rebuttal testimony touched on matters not covered in his taped statement, and that there were jails in El Cajon and downtown San Diego in which one of the two men could have been placed. She urged that the government's failure to disclose the two witnesses' housing arrangement constituted misconduct under state law, and violated defendant's due process right to be provided favorable material evidence (e.g., *Kyles v. Whitley, supra,* 514 U.S. 419; *United States v. Bagley, supra,* 473 U.S. 667; see *ante,* at p. 279).

In addition to his motion to reopen his case, defendant moved for a mistrial with or without prejudice, or a lesser sanction. The trial court denied the motions. It ruled: "The court has no facts before it to show the scheme of the People to procure false testimony. In point of fact this record would seem to speak to just the opposite. The taping occurred well before this memo [by the sheriff's department]. The reasons given for the placement certainly make sense in terms of protecting inmates." It further ruled, in response to defendant's request for clarification, that the sheriff's document was irrelevant.

Defendant is not entitled to relief on the grounds urged on appeal, or on the ground urged at trial of withholding favorable material evidence.

"We review for abuse of discretion a trial court's ruling on a motion to reopen a criminal case to permit the introduction of additional evidence." (*People v. Marshall, supra,* 13 Cal.4th 799, 836.) We find none here. Nor do we find any prosecutorial misconduct. Defendant could produce no evidence that the prosecution enabled Mendoza and Meza to confer and tailor their testimony, or that of Mendoza, or that Mendoza's testimony was altered as a result of his lodging in the South Bay jail. Nor was defendant denied any right to present a defense, or more precisely, evidence relevant to the theory of his defense. Such a right does not require "the court [to] allow an unlimited inquiry into collateral matters," which this surely was; rather, "the proffered evidence must have more than slight relevanc[e]." (*Ibid.*) Finally, because informing defendant of the two men's confinement arrangement would not have created a reasonable probability of a different outcome, we discern no violation of the due process right to be provided with favorable material evidence. Nor do we discern the denial of any right to a reliable guilt and penalty determination.

The motion for a mistrial, with or without prejudice, was also properly denied. In *People v. Welch* (1999) 20 Cal.4th 701, 749 [85 Cal.Rptr.2d 203, 976 P.2d 754], we reiterated that we review such a ruling for an abuse of discretion, and we implied that a motion for mistrial should be granted only when " 'a party's chances of receiving a fair trial have been irreparably damaged.' " We apply that standard here. (Accord, *People v. Hines* (1997) 15 Cal.4th 997, 1038 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) As shown by our discussion above, there was no irreparable damage to defendant's chance of having a fair trial: in the absence of any evidence of collusion, the inmates' housing arrangement was irrelevant.

XV. *Refusing to Give Instruction Based on Confinement Arrangement*

On the basis of his belief that the government had given Mendoza and Meza the opportunity to collude by confining them in the South Bay jail,

defendant sought the following instruction: "If you find the prosecution or its agents influenced or attempted to influence the testimony of witnesses who have testified in this case, you should consider such fact in evaluating the credibility of the witness and as an inference of the Defendant's innocence. The weight to be given this evidence is a matter for your determination."

The trial court denied the request. Defendant claims that this refusal violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

As a matter of state law, however, we have long held that "[t]he jury need not be instructed on a theory for which no evidence has been presented." (*People v. Roberts* (1992) 2 Cal.4th 271, 313 [6 Cal.Rptr.2d 276, 826 P.2d 274].) As stated in our discussion of defendant's contention regarding his motion to reopen, there was no such evidence. And we know of no authority creating a constitutional right to have the jury instructed on theories unsupported by evidence. (See *ibid.* [referring to the federal due process clause]; *Neuman v. Rivers* (6th Cir. 1997) 125 F.3d 315, 323-324 [same]; see also *Hopper v. Evans* (1982) 456 U.S. 605, 611 [102 S.Ct. 2049, 2052-2053, 72 L.Ed.2d 367] [no due process right to lesser included offense instruction unless warranted by evidence].)

XVI. *Denying Several Motions for Mistrial*

 At least six times during trial, defendant moved for a mistrial. In each case the trial court denied his motion. He claims that five of the rulings violated his right to due process, which is secured by the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (He also refers, without elaboration, to the Sixth and Eighth Amendments to the federal charter.)

The claims' essence is that the trial court erred in denying motions for mistrial following what defendant perceived to be prosecutorial misconduct or other trial defects for which the government was responsible.

As stated, we review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged. In turn, " '[t]he applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the

conviction a denial of due process." ' " [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Ochoa, supra,* 19 Cal.4th 353, 427.)

 We will explain that the trial court did not abuse its discretion on any occasion.

First, defendant claims that the prosecutor improperly asked Eduardo "Lalo" Sanchez Galdan (Sanchez) in front of the jury whether he had been threatened. After he asked the question, Sanchez explained outside the jury's presence that an investigator for Hector Ayala, not defendant himself, had threatened him to tell the truth or suffer possible physical consequences, and that another investigator named Eric Hart was present. The prosecutor explained that he believed Hart (apparently an investigator for defendant) was present at the time the threat was made, that in one version of the descriptions of the threat the need to tell the truth was not mentioned, and that Sanchez's demeanor in court suggested that he was afraid to testify fully.

The trial court ruled that the prosecutor had asked the question in good faith and denied the motion for mistrial, which defendant made on state law grounds. It did not abuse its discretion. The record, described above, supports its conclusion that the prosecutor asked the question in good faith. Because there was no prosecutorial misconduct as defined in state law, there was no basis for a finding of mistrial.

Next, defendant contends that sheriff's deputies acted improperly by barring two members of the public from the courtroom. Counsel asserted that jurors had seen the deputies' intervention and that it would prejudice defendant's right to a fair trial.

The trial court inquired of two deputies, who stated that the district attorney's office had asked them to watch for "suspicious looking" attendees, particularly gang members, and that they had asked two people for

identification on leaving the courtroom (an order to which one of the two loudly objected). They told them not to go back in and informed the prosecution, which told them to let them enter. The court instructed the deputies not to engage in such actions again.

Counsel then argued that a mistrial was justified because the deputies' actions had enhanced an "atmosphere of fear" that the prosecution had been trying to create during the trial. The trial court disagreed, ruling that "[t]here's no basis for a mistrial."

We find no abuse of discretion. The trial court was able to gauge the extent of the disruption of the proceedings and the effect on the jury, and found that nothing justified a mistrial. On this record, we agree. The question is whether there is a reasonable likelihood that the incident prejudiced the jurors against defendant. (See *In re Hamilton* (1999) 20 Cal.4th 273, 296 [84 Cal.Rptr.2d 403, 975 P.2d 600].) We discern no such likelihood.

As part of this subclaim, defendant contends that the trial court committed prejudicial error when it permitted Juan Manuel Meza, testifying before the jury, to suggest that defendant had served time in prison. The record belies the assertion. Meza was referring to events that occurred when he, Meza, was in prison. Even if Meza's initial volunteered and nonresponsive comment—"I'd hear a lot about [defendant] in prison"—was ambiguous, the prosecutor, at the court's instruction following its denial of defendant's mistrial motion, erased any ambiguity before the jury by asking Meza a question that made clear he was discussing events during his own confinement in prison. He made no suggestion that defendant was also in prison. The claim is without merit, and the motion for mistrial was properly denied.

Defendant also renews the mistrial argument that he has already made, without success, *ante*, at page 282.

Next, defendant claims that the trial court erroneously denied a motion for mistrial he made after he learned the jury would hear Rafael Mendoza Lopez's recantation during the prosecution's rebuttal case. His counsel argued in essence that the jury would inevitably, in the course of the parties' examination of Mendoza on rebuttal, have to hear prejudicial evidence of his involvement with the Mexican Mafia. Counsel also argued that defense counsel might be required to testify, and that some of Mendoza's taped assertions impugned her integrity, so that counsel might have a conflict of interest in continuing to represent defendant. But as we have explained, *ante*, at pages 274-275, no references to the Mexican Mafia resulted. With regard

to a possible conflict of interest, the motion was premature—Mendoza's taped statement did not inevitably require testimony that might create a conflict of interest. The court did not abuse its discretion in denying the motion for mistrial.

In sum, the motions for mistrial all were properly denied. At no time was defendant's chance of receiving a fair trial irreparably harmed. To the extent he claims that prosecutorial misconduct occurred in violation of the due process clause of the Fourteenth Amendment to the United States Constitution, or claims a violation of any other constitutional provision, we perceive none, and therefore no basis, constitutional or otherwise, on which a motion for mistrial should have been granted.

## XVII. *Ineffective Assistance of Counsel*

 Defendant brings additional claims of ineffective assistance of counsel.

First, he contends that counsel were ineffective for failing to request an instruction that would have limited the jury's ability to consider evidence of his gang membership. We find no deficient performance. Because of the parties' and trial court's sedulous efforts, there was no evidence of defendant's involvement with any gang. The factual basis for his claim on appeal is incorrect.

Next, defendant contends that counsel were ineffective for failing to ask the trial court to assign misconduct to references to his gang membership during the prosecution's closing argument. Again, however, the record belies his claim. The prosecutor, in attempting to bolster or weaken the credibility of Juan Manuel Meza, Pedro Castillo, Eduardo Sanchez Galdan, and Rafael Mendoza Lopez, argued that all were afraid of defendant and, to provide a representative example of the prosecutor's wording, "those people who associated with the defendant"—a fear that accounted for aspects of their testimony. He carefully avoided referring to the Mexican Mafia or any other gang by name. The argument was proper, and there was no basis on which counsel should have asked the trial court for a ruling against it. (Moreover, in the case of the prosecutor's reference to Sanchez, counsel did ask the court to cure harm he felt arose from the prosecutor's impugning Sanchez's credibility on the basis of his fear. There was no occasion at that point to object to any reference to gangs, however, because there was none.)

The prosecutor, referring to certain witnesses, argued that "[t]hose people who now are willing to come forward have done so, and they have taken a

substantial risk . . ." and acted "at great peril to themselves." Defendant also finds fault with this remark and claims ineffective assistance of counsel for failing to request an assignment of misconduct. In our view, however, the prosecutor was asking the jurors to take note of others' courage and not shirk their own responsibility—in fact his following remarks so show. We discern no deficient performance by counsel in failing to object to these remarks; they were proper argument.

Next, defendant renews his claim that counsel were ineffective for failing to present the testimony of Richard Savocchio. We have already considered and rejected this claim *ante*, at pages 274-275.

Finally, defendant claims he received ineffective assistance of counsel because they were absent during the rereading of certain testimony. We address (and reject) this claim *post*, at page 289, where he more fully raises the issue.

In sum, defendant has not shown that he received ineffective assistance of counsel during the guilt phase.

XVIII. *Counsel's Absence While Certain Testimony Was Reread*

Defendant asserts that he was denied constitutional rights and rights under the Penal Code—namely to be present during trial, to be assisted by counsel during a critical stage of the trial, and to a public trial—when counsel decided not to be present during the rereading of certain testimony, the testimony was reread in the jury's deliberation room rather than in open court, and the jury interrupted the court reporter before she had completed reading all the testimony requested. He cites the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, article I, section 15 of the California Constitution, and Penal Code sections 977 and 1043.

During deliberations the jury asked for the testimony of Juan Manuel Meza and Miguel Angel Lopez. Defense counsel decided, because the jury wanted to review so much testimony and was making its request so early in the deliberations, not to be present during any rereading of the two witnesses' testimony unless the jury was seeking only excerpts. The trial court estimated that to reread all of Meza's and Lopez's testimony would require about 11 hours.

The trial court said it would direct the reporter to read back the testimony, but not the full content of the transcripts, which contained sidebar conferences, questions to which objections were sustained, and the like. It said that

it would review the transcripts with the reporter in advance to make sure this was done.

The jury thereafter decided that it only wanted to hear Meza's testimony, a process that the prosecutor estimated would take seven and one-half hours. The trial court said it would have the testimony read in the courtroom if counsel desired to be present, but otherwise in the jury room. Defense counsel and defendant agreed to waive their right to be present, and to let the jurors hear the readback in the room in which they were deliberating.

The record next shows the trial court's announcing that the jury had reached a verdict. The court also read a note from the foreperson informing the court that the jury had asked the court reporter to stop reading Meza's testimony in the midst of defendant's cross-examination. Defense counsel expressed concern that the jury had not had all of Meza's testimony reread, and the court commented that neither it, "nor any court, to my knowledge, can direct a jury as to how to conduct their deliberations."

"Pursuant to section 1138, the jury has a right to rehear testimony and instructions on request during its deliberations. [Citations.] Although the primary concern of section 1138 is the *jury's* right to be apprised of the evidence, a violation of the statutory mandate implicates a defendant's right to a fair trial conducted ' "substantially [in] accord[ance] with law." ' " (*People v. Frye* (1998) 18 Cal.4th 894, 1007 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

We have repeatedly rejected the claims defendant raises here. The rereading of testimony is not a critical stage of the proceedings (*People v. Horton* (1995) 11 Cal.4th 1068, 1120 [47 Cal.Rptr.2d 516, 906 P.2d 478] [by necessary implication]), and defendant waived his right to be present in any event.[8] His claim is without merit. (See also *People v. Fauber* (1992) 2 Cal.4th 792, 836-837 [9 Cal.Rptr.2d 24, 831 P.2d 249] [absent a showing of an unfair trial, absence during rereading of testimony does not offend due process].) And because defendant waived any right he might have had to a public trial during the rereading, he cannot now complain that he was denied that right—he invited any error. (See *People v. Lang* (1989) 49 Cal.3d 991, 1028 [264 Cal.Rptr. 386, 782 P.2d 627].)

---

[8]It appears that defendant only orally waived his right to be present during the rereading of testimony. As current section 977 does now, former section 977 required a written waiver. (Stats. 1968, ch. 1064, § 1, pp. 2064-2065.) But "[i]n general, 'the defendant's absence from various court proceedings, "even without waiver, may be declared nonprejudicial in situations where his presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' " [Citations.]' " (*People v. Dennis* (1998) 17 Cal.4th 468, 538 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) That threshold was not reached here. No waiver was required, so whether defendant's waiver was oral or written is immaterial.

We also reject defendant's claim that counsel's decision to waive any right to be present during the rereading constituted ineffective assistance of counsel. Even if such a right were established, defendant could not show prejudice. First, " 'It is presumed that official duty has been regularly performed. . . .' (Evid. Code, § 664.) This presumption applies to . . . court reporters . . . ." (*People v. Wader* (1993) 5 Cal.4th 610, 661 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Therefore we assume the reporter properly read the testimony until stopped by the jury. And even if counsel had been present and demanded that the reporter continue to reread the testimony, defendant could not have compelled the trial court to order the jury to continue to listen to the rereading of testimony once it was satisfied it had heard enough. Defendant concedes as much, and he is correct. (*People v. Gordon* (1963) 222 Cal.App.2d 687, 689 [35 Cal.Rptr. 335]; *People v. Cathey* (1960) 186 Cal.App.2d 217, 221-222 [8 Cal.Rptr. 694]; *People v. Smith* (1906) 3 Cal.App. 62, 67-68 [84 P. 449].)

### *Guilt Phase Conclusion*

In sum, we conclude that defendant did not suffer prejudicial error during the guilt phase of his trial.

### THE PENALTY PHASE

### *Facts*

The penalty phase began on November 14, 1988.

### A. *Prosecution Case*

Asserting that "Enough is enough," the prosecution urged that defendant was an incorrigible and dangerous criminal for whose past and future misconduct execution was the proper answer. The defense reserved its opening statement.

### 1. *Adjudicated Crimes*

The parties stipulated that defendant had suffered six prior felony convictions during the past 18 years: for vehicle theft, robbery, possessing a sharp instrument in prison, possessing heroin, and twice for burglary.

### 2. *Unadjudicated Crimes*

Following the announcement of the stipulations to the jury, the prosecution presented evidence of defendant's prior unadjudicated violent crimes (§ 190.3).

### a. *Killing John Casas at Folsom Prison*

Glenn Albrecht, an inmate with a long record of felony convictions, testified that on the evening of February 21, 1980, he saw defendant stab John Casas to death in a shower area at Folsom Prison. At the time he testified, Albrecht was in custody at Avenal State Prison, and had about a year left to serve on a sentence for possession of marijuana for sale.

On cross-examination, Albrecht acknowledged that he was a known and habitual prison informant and that he had testified against a former friend in another case.

Walter Joe Lewis, convicted of murder twice and of two other felonies, testified that he was taking a shower on February 21, 1980, and saw defendant stab another inmate—plainly Casas, though Lewis did not know the victim's name. He acknowledged that in exchange for his cooperation at trial the district attorney's office would try to have him transferred to another prison. He also acknowledged that the day after Casas was killed an individual from the district attorney's office interviewed him and, to protect himself, he denied having seen the killing. Instead, he reported defendant to the authorities on August 5, 1987, writing a letter to a Department of Corrections lieutenant at Tehachapi State Prison. He denied knowing that defendant had been charged with another crime when he wrote to the authorities—instead, he reported him in an effort to be transferred out of Tehachapi, which he regarded as a "dull" institution because it lacked sufficient educational opportunities—but he also testified, perhaps inconsistently, that he was testifying because "I made a personal decision. I felt if I'd came [*sic*] forward in 1980, we wouldn't be here today."

On cross-examination, Lewis acknowledged that he had decided to become a jailhouse informant in 1986. Lewis, who the record indicates is Caucasian, also acknowledged that he had been a member of the White supremacist Aryan Brotherhood prison gang, had been involved in racial conflicts with African-American inmates, was eligible for parole in 1991, and wanted to quit the gang and be moved out of a housing unit associated with it because he was less likely to obtain parole if still linked to it. He also acknowledged that the way to satisfy the prison authorities that his desire to leave the Aryan Brotherhood was genuine was to inform on other inmate members of the gang. And he acknowledged writing to a prison official in March of 1988 that if his transfer request was not granted he would not testify against defendant, and that he expected the prosecution to continue to seek a transfer for him following his testimony.

Dr. Anthony Victor Cunha, a forensic pathologist who examined Casas's body the day after he was killed, testified that he died of a stab wound to the heart.

b. *Other Unadjudicated Crimes*

i. *Chula Vista Robbery in 1972*

Hilda Casteneda Paul testified that on November 24, 1972, defendant and another robbed the Pantry clothing store on Broadway in Chula Vista. He ordered her and other employees at gunpoint to lie on the floor, and then directed one of them to open a floor safe. The robbers also stole some jackets.

ii. *Stabbing in San Quentin Prison in 1975*

Wallace Williams, a former inmate, testified that he was in the exercise yard of a high-security unit of San Quentin Prison on the afternoon of November 23, 1975, when a fight broke out. He received minor injuries. Defendant was in the yard that day.[9]

Bobby Jack Kennedy, then a sergeant in the Department of Corrections, was on duty in the yard that day, and testified that there may have been a slight overabundance of African-American prisoners. He described a melee that broke out after a Caucasian or Hispanic inmate tossed a glass jar at an African-American individual. Williams retreated, with a Hispanic inmate stabbing him. The assailant discarded a shank that the authorities retrieved. Cecil Eugene Jordan, then also a sergeant in the Department of Corrections, also was on duty in the yard that day, and he testified about the retrieval of the shank. After the quarrel he identified Ayala as the person who had discarded the shank.

iii. *Stabbing in San Quentin Prison in 1977*

Richard Christiansen was serving a term at San Quentin Prison on October 27, 1977. He testified that he was in the high-security exercise yard that day. Without provocation, defendant ambushed him, grabbing his hair from

[9]On cross-examination, Williams described difficult living conditions and a high level of racial and other tensions in the high-security North Block management control unit that he and defendant occupied at San Quentin. Violent confrontations occurred regularly. Prison guards, sometimes accidentally and at other times deliberately, would let a racially unbalanced group of inmates into the exercise yard, and the imbalance would cause tension and often fights. There was such an imbalance on November 23, 1975, with a disproportionate number of African-Americans in the yard; and shortly before, a Hispanic inmate had been stabbed near the unit dining hall. Williams also testified in essence that a prison sergeant tried to goad him into taking revenge for the attack that injured him.

behind, pulled him backward, and stabbed him in the face. Christiansen required seven stitches.[10]

Rogers L. Larry and Kenneth Blasingame, both correctional officers at San Quentin at the time, confirmed Christiansen's account in their testimony. And then-Correctional Officer Kenneth Otis Spoon testified that after the incident he searched the yard and found a weapon.

### iv. *Stabbing in Soledad Prison in 1982*

Alex Macugay testified that he was a trusty in a high-security unit of Soledad State Prison on November 30, 1982. There was antipathy between him, a northerner, and the "southern group" of Mexican inmates, and he tried to avoid them. Ayala was in the southern group. Macugay paused to talk with other inmates in a cell, and Ayala started stabbing him from behind with a shank. Macugay testified in essence that he knew of no reason for Ayala to feel hostility toward him personally. The attack ended when a guard opened fire with birdshot, wounding Macugay and defendant, after which defendant slipped his shank under some bleachers. Correctional Officer Primitivo Castro and Department of Corrections Lieutenant Russell Pope confirmed Macugay's testimony. Castro testified that he had to shoot defendant in the back with birdshot to get him to stop stabbing Macugay.

### B. *Defense Case*

Defendant did not testify at the penalty phase, but he called a large number of witnesses. In her opening statement, defense counsel conceded the validity of the felony convictions defendant had suffered, and she also conceded that he robbed the Pantry clothing store in 1972 and stabbed several inmates as alleged in the prosecution's case. Counsel denied, however, that defendant killed John Casas. As for the other crimes, she told the jury that she would place them in the context of prison life, and particularly of prison gangs' operations. (The parties had agreed at a sidebar conference that during the penalty phase they need no longer rely on euphemistic references to groups, but instead could ask witnesses explicit questions about prison gangs.)

Counsel stated that in the main, the penalty phase defense would focus on defendant's character and background. Defendant "was born into a world of

---

[10]On cross-examination, Christiansen confirmed that the atmosphere in the high-security unit at San Quentin Prison remained tense in 1977 for racial reasons, although by then prison policy kept African-Americans from contact with Hispanic or Caucasian inmates in this high-security setting. Christiansen was in high security because of White supremacist tattoos he bore.

violence, and he lived even as a young child in a world of violence." Counsel told the jurors in essence that she hoped they would see defendant as more complex than the "cardboard figure" the prosecution had created, and would decide his fate "not based on a series of crimes, but looking at [him] squarely as a man, as a human being."

Much of the defense strategy consisted of an effort to place defendant's violence in the context of the California prison system of the 1970's and 1980's. As shown by the testimony of Wallace Williams and Richard Christiansen, defendant raised this issue even before his own penalty phase case-in-chief.

The defense began its presentation of evidence with the testimony of Royce Hamilton, who was a correctional officer at San Quentin Prison essentially from 1975 to 1979. Hamilton testified that San Quentin was suffused with "extreme racial tension" when he started his work there, and was in a state of lockdown because of recent murders. Stabbings occurred throughout 1975. The North Block management control unit defendant was confined in had an even higher rate of violence in 1977 than San Quentin's ultra-high-security "adjustment center" unit. For safety reasons, inmates were segregated by race.

Hamilton described the November 23, 1975, stabbing incident (see *ante*, at p. 291) as a fracas involving defendant and other inmates who were African-American. He testified that defendant was slight of build at the time, and that he was a pleasant individual. He also testified in narrative form about the nature of prison life, and the forms of psychological pressure available to the guards to obtain information from inmates.

On cross-examination, the prosecution established that Hamilton knew very little about the details of the stabbing incident.

John Keith Irwin, a professor of sociology at San Francisco State University and a criminologist, testified as an expert in prison culture and conditions. (Irwin's expertise about prison drew in part from his own experience—he had served a five-year term at Soledad State Prison for an armed robbery of which he was convicted in 1952.) In long sessions of direct and cross-examination, he provided the jury with a detailed history of California prison society over recent decades—of the informant's changing role and status, the rise and spread of prison gangs, and the creation and expansion of high-security housing for inmates considered troublemakers.

Irwin testified that in the 1970's inmates in high-security housing felt pressed to join gangs, and that in high-security units, where race-based

predation was the norm, preemptive and retaliatory violent acts were necessary to avoid being perceived as weak and thereafter preyed upon. Only the "exceptional inmate" would live in a high-security unit without being involved in an incident. He also testified that a federal court decision, apparently *Toussaint v. McCarthy* (N.D.Cal. 1984) 597 F.Supp. 1388, affirmed in part and reversed in part (9th Cir. 1986) 801 F.2d 1080, concluded as a matter of law that conditions in defendant's high-security North Block unit were inhumane. (See 801 F.2d 1080, 1099, 1108.)[11] On the question of prison informants, he testified that prisoner informer information is "very unreliable," though he later backtracked from that statement, acknowledging that much informant reporting is factually accurate.

Similarly, Craig William Haney, a professor of psychology at the University of California, Santa Cruz, testified as an expert regarding living conditions in prison, particularly those in San Quentin Prison during defendant's confinement there. (Apparently his expertise was not in dispute, and the trial court never made a ruling regarding the scope of it.) The essence of Haney's testimony was that defendant's incarceration in state prison amounted to a form of psychological torture.

Haney testified that defendant was moved from San Quentin's adjustment center to its North Block about October 15, 1975, and thence back to the adjustment center following the November 23, 1975, fight (*ante*, at p. 291). In April of 1976 he was transferred to Chino State Prison, and in July 1976 he returned to various locations in San Quentin's high-security housing.

In March of 1979 defendant received parole, and was released directly from high-security confinement. In December of that year, after violating parole, he was sent to Folsom State Prison in February of 1980 (where, according to evidence before the jury, he killed John Casas; see *ante*, at p. 290). After the death of Casas defendant was again placed in high-security housing, this time at Folsom, from which he was directly paroled in May of 1980. In March of 1981 he returned to prison for a short time, apparently was released again, and remained unconfined until early in 1982, at which point he returned to San Quentin's high-security housing again. He remained in such housing either in San Quentin or in Soledad State Prison until he was

---

[11]*Toussaint* quoted from the findings of the lower court: " 'Lockup units at San Quentin and Folsom are counted among the most violence-racked correctional facilities in the United States. In part, this is due to the California Department of Corrections policy of concentrating the most violence-prone offenders in these two institutions. In part, it is caused by the horrendous physical conditions, including double-celling. In part, it is due to the crowding of both facilities beyond design capacity. In part, it may be due to the fact that lockup units have no programs. But in large measure, it originates in the violent propensities of segregated inmates themselves.' " (*Toussaint v. McCarthy, supra,* 801 F.2d 1080, 1108.)

released on parole January 15, 1985, directly from San Quentin's North Block to the outside. In sum, he spent about eight of nine years in prison in especially restrictive confinement.

Except for Chino's, Haney was familiar with conditions in the high-security housing units at the time of defendant's confinement in them. He had studied "how these conditions of confinement were affecting the people that were confined there, . . . the kinds of psychological changes that were taking place in them."

Haney characterized the San Quentin North Block in which defendant lived as cavernous, odoriferous, dimly lit, oppressive, "incredibly filthy," "deafening," vermin infested, and racially tense. Each cell had the length and breadth of a king-sized bed, and inmates were often double-celled. They remained in their cells almost all the time. The "overriding effect . . . these conditions created in people was pain," which manifested itself in "a tremendous amount of . . . anger, frustration, even rage . . . ."

Defendant, according to Haney, spent 40 consecutive days in the San Quentin adjustment center's most severely confining subunit of "quiet cells" or "strip cells." When given opportunities to be released from his quiet cell, he would utter insults and be kept there. Haney testified that because an inmate in a quiet cell would be totally isolated and essentially deprived of any sensory stimulus, a 40-day stint would be psychologically "horrible." Haney also characterized Soledad State Prison as a "school for gladiators" in "the early-mid 1970s," a prison "whose reputation . . . instilled fear in even experienced convicts." Defendant was imprisoned at Soledad from January 1974 to June 1975.

On cross-examination, Haney acknowledged that he had not done any psychological testing of defendant.

William Underwood, a retired California Youth Authority employee, testified as an expert in the operations of the state and local juvenile justice systems when defendant was under their supervision. It was his opinion that defendant had been treated harshly in the juvenile justice system, and that San Diego County's juvenile justice programs were tainted by inflexibility, indifference, and other forms of inadequacy. He also testified that defendant managed to obtain a high school diploma while a California Youth Authority ward, a rare accomplishment. His testimony also revealed, however, that defendant had an extensive history of alleged or established misconduct as a juvenile, including allegations of participating in an attack on a store employee.

There was testimony that touched on defendant's relations with other prisoners.

Raul Garcia, a Department of Corrections sergeant stationed at Avenal State Prison, testified that Glenn Albrecht (see *ante*, at p. 290) was a leader among the "northern Hispanics" in that prison, and that he would naturally be hostile to southern inmates such as defendant.

Correctional Officer David James Amaro testified that defendant worked for him in prison in 1981 as a tier tender, a position of responsibility, and fulfilled his duties properly.

There was also testimony regarding defendant's background and character.

Doris Virginia Stein, a retired teacher, taught sixth grade at Lincoln Acres Elementary School in National City in 1963. Defendant was a pupil. She testified that he was "a very lovable boy," though he got into fights occasionally. He was a poor student, and was the butt of ethnic taunts from some classmates, most of whom were of Anglo background.

Richard C. Cervantes, Ph.D., a licensed clinical psychologist, was designated an expert on stress experienced by Mexican-Americans. Having interviewed defendant and members of his family and reviewed his juvenile probation reports, Cervantes testified that defendant's family "experienced an inordinate amount of violence" and "turmoil," particularly when his father, Rogelio "Joe" Ayala, "had been drinking." Defendant's parents would physically battle each other, and he and his brother Hector would try to break up the fights. Rogelio Ayala would threaten defendant's mother, Rosa Saenz, with a knife (and she in turn once stabbed him), and would strike defendant and Hector with a stick. Rogelio Ayala's violence toward Rosa Saenz caused the parents to separate frequently.

An intelligence quotient test administered when defendant was 12 years old indicated that he was of average intelligence.

Cervantes further testified that in his late teens defendant began to abuse alcohol and barbiturates, and when about 17 years old he robbed a taxi driver, an offense for which he was sent to the California Youth Authority. Released about two years later, he resumed his consumption of barbiturates, though he also found work at General Dynamics Corporation.

Barbara Moreno, defendant's sister, testified that defendant was "a very caring brother" when they were growing up. She also described their father's

drunken attacks on their mother. She blamed defendant's conduct on his abuse of drugs, and testified that he has a daughter. His half sister, Marjorie Suarez, a schoolteacher in the Madera County hamlet of Coarsegold, called life in defendant's home "chaotic."

Ernestina Meyer, defendant's cousin, described his happy demeanor as a child. She described a knife attack by Rogelio Ayala on Rosa Saenz when defendant was about 16 years old. She ran to get help for Saenz and found defendant crying in his bedroom.

Richard Raul Suarez, defendant's nephew, described him as a mentor and as "compassionate."

Rita Jenkins, the aunt of defendant's late wife and a veteran San Diego County probation officer, testified in essence that defendant desired the best for his young daughter, whom he had placed in the care of Jenkins and her husband.

The Reverend Jackie Christopher Hilliard, a former correctional officer, had supervised defendant at San Quentin Prison. He described race-based abuse of inmates by prison staff in defendant's unit, and the harshness of life there, both for staff and inmates. He testified that defendant treated him with respect, and at one point demonstrated artistic talent with a well-rendered card congratulating him on his new baby. He testified that defendant had matured and deserved another chance at life.

Geraldine Moses, a practitioner of Buddhism, testified that over the course of some three years she had become friends with defendant in the San Diego County Jail. She described him as "a very caring individual" who had gained self-awareness and undergone positive psychological change during the time of their acquaintance.

C. *Prosecution's Rebuttal*

The prosecution read to the jury a letter that defendant sent to a friend in 1982 or 1983. He wrote that he was in the San Quentin Prison adjustment center but that "it's no big thing for me, cuz I can do anytime they give me and more if I have to. . . . [T]his is all routine . . . and after awhile it gets good. . . . It ain't all that bad here in the adjustment center cuz I got me a TV and radio so you [know] I'm jailing first class."

D. *Argument*

In closing argument, the prosecutor compared defendant to a lifelong terrorist and called him an executioner with a demonstrated inability to

conform his conduct to moral and legal norms, in prison or outside. "The death penalty was designed for the defendant."

In her closing argument, defense counsel appealed to the jury for mercy, arguing that they could impose the lesser penalty even if they could not articulate a logical basis for it. But she also argued that the lesser penalty was logical and justified: that defendant would be severely punished by a life alone in a cell, and that the death penalty should be reserved for the worst murderers, a category that excluded him. She argued that his environment had limited his choices and that he had long inhabited a demimonde with different rules of conduct. She paraphrased the district court's factual findings in *Toussaint v. McCarthy, supra,* 597 F.Supp. 1388, regarding conditions in the high-security units of San Quentin Prison at the time of his imprisonment. She argued that the evidence suggested Alex Macugay attacked defendant at Soledad State Prison in 1982, rather than vice versa. She questioned the sufficiency of the evidence that he killed John Casas. And she argued that the presence of an unidentified fingerprint on the duct tape binding Ernesto Dominguez Mendez (*ante,* at p. 248) created a lingering doubt about the circumstances of the three murders that justified a penalty less than death.

Five days after counsel concluded her remarks the jury returned its verdict of death.

ISSUES ON APPEAL

XIX. *Timeliness of Presenting Notice of Aggravating Evidence*

Section 190.3 requires that the prosecution give reasonably timely notice before trial of the aggravating evidence it intends to introduce. As stated, the case was called to trial on April 15, 1988.

Exactly one year before trial began, the prosecution filed a notice that listed the crimes' circumstances and defendant's record of prior felony convictions, but contained no mention of unadjudicated prior violent criminal activity, which is also evidence that may be introduced in aggravation (§ 190.3). Defendant moved to strike the notice, arguing that it was defective. At a hearing the trial court denied the motion, but ruled that any amendment to the notice must be filed, and information regarding evidence in aggravation must be furnished to the defense, 60 days before the case was called to trial.

On July 10, 1987, the prosecution, having received defendant's prison record, evidently filed an amended notice that listed 28 unadjudicated acts in

aggravation, including killing Casas, robbing the Pantry clothing store, and the three prison stabbings.[12] Defendant objected to the amended notice as amounting to retaliatory and vindictive prosecution because it was filed in reaction to his opposition to the earlier filing. In reply, the prosecution stated that it received defendant's prison record, which revealed the unadjudicated incidents, 12 days after filing its initial notice, and that was the reason for the amended filing. The trial court denied defendant's motion, ruling in essence that there was no evidence of a retaliatory act or a vindictive mental state. Ultimately, of course, the prosecution limited its presentation of evidence of unadjudicated criminal activity to the incidents described herein.

Defendant renews his claim that the amended notice was filed vindictively, in violation of the due process clause of the Fourteenth Amendment to the United States Constitution and article I, section 15 of the California Constitution.[13]

We disagree. The trial court ruled that there was no evidence of vindictive prosecution, and under any standard of review, its ruling was sound: the record is bereft of any such evidence.

Defendant also complains that the trial court should have imposed a sanction for the prosecution's inadvertent failure to turn over documents relating to the Pantry robbery at least 60 days before trial, as the court's discovery order required. The trial court refused to impose a sanction for the oversight.

We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard. (See *People v. Breaux* (1991) 1 Cal.4th 281, 312 [3 Cal.Rptr.2d 81, 821 P.2d 585].) In particular, "a trial court may, in the exercise of its discretion, 'consider a wide range of sanctions' in response to the prosecution's violation of a discovery order." (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 792 [7 Cal.Rptr.2d 152].)

The trial court did not abuse its discretion. First, although the prosecution failed to furnish the Pantry robbery documents 60 days before trial, they were only relevant to the penalty phase, and it did furnish them on May 19, 1988—about five months before that phase began. Second, on October 18, 1988, six days after the jury returned its guilt phase verdicts, defendant moved for a continuance to prepare for the penalty phase. The next day the

---

[12]The record does not contain the amended notice. Nevertheless, defendant's motion to strike it reveals its contents, and there is no dispute about them.

[13]Defendant also refers to a due process right under the Eighth Amendment to the United States Constitution. We disregard this claim *ab initio*, because it is unsupported by the Eighth Amendment's text.

court gave him one until November 14. Even assuming, against all likelihood, that five months was insufficient time to prepare a defense to the evidence, the continuance by itself served as a remedy for the violation, whether so denominated by the court or not—defendant had more than a month after the guilt phase verdicts to prepare for the penalty phase. We find no abuse of discretion in the court's refusal to impose a sanction.

## XX. *Delay in Presenting Evidence of Casas Killing*

As stated *ante*, at page 290, John Casas was killed in 1980. Defendant claims that failing to try him at the time and presenting evidence of the killing eight years later violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, section 15 of the California Constitution. He asserts that because an exculpatory witness was lost in the interim and he suffered other disadvantages through the passage of time, the law invalidly "required him to defend against stale acts." (*People v. Stanley* (1995) 10 Cal.4th 764, 822 [42 Cal.Rptr.2d 543, 897 P.2d 481].) At oral argument, his counsel emphasized the evidence's probable severe impact: the prosecution was presenting the jury with evidence suggesting that, as someone who had already murdered while in prison, he was highly unsuitable for life imprisonment. Nevertheless, we have repeatedly rejected this claim. (*Ibid.*) We decline to reconsider our prior decisions.

## XXI. *Limiting Cross-examination of a Witness*

 Defendant claims that the trial court erred under Evidence Code section 352 and that the proceedings violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution when the court refused to allow him to inquire of Walter Joe Lewis, whose testimony is summarized *ante*, at page 290, whether he had made threats and committed violent acts.

Defendant wanted to ask Lewis on cross-examination whether he had committed murder and assaults in prison. He asserted that if his character was on trial in the penalty phase, so should be the adverse witnesses'; but the trial court disagreed. It ruled that impeaching character evidence in the form of specific instances of Lewis's conduct was unduly prejudicial character evidence, and that "we're not going to try Mr. Lewis."

Though it did not cite a statute in the record, the trial court may have made its ruling under Evidence Code section 787, which provides that "evidence of specific instances of his conduct relevant only as tending to

prove a trait of his character is inadmissible to attack or support the credibility of a witness." The trial was completed before we filed *People v. Harris* (1989) 47 Cal.3d 1047 [255 Cal.Rptr. 352, 767 P.2d 619], in which we held that the California Constitution forbade applying section 787 in criminal cases. (*Harris*, at p. 1081.) Our holding responded to the People's argument that "the statutory limitations on the admission of evidence relevant to a *witness's* honesty or veracity are no longer applicable in criminal cases, except to the extent that exclusion is ordered pursuant to Evidence Code section 352." (*Ibid.*) Our holding that section 787 could no longer be applied in criminal cases should be viewed in the context of that argument. (See also *People v. Wheeler*, *supra*, 4 Cal.4th 284, 299, fn. 10 [limiting and clarifying *Harris*].)

Defendant did not raise the claim at trial that Evidence Code section 787 had been abrogated. He thus failed to preserve it for review. (*People v. Von Villas* (1992) 10 Cal.App.4th 201, 267-268 [13 Cal.Rptr.2d 62].) In any event, as implied by the context of *Harris, Von Villas* correctly held that the California Constitution did not, notwithstanding the limitation of Evidence Code section 787, forbid excluding evidence that fell within that statute's ambit if a trial court properly ruled that the evidence should also be excluded under Evidence Code section 352. (*Von Villas*, *supra*, 10 Cal.App.4th at pp. 268-269.) Implicitly, the trial court here ruled that the evidence would "mislead[] the jury" (Evid. Code, § 352) because it would be confusing to appear to place Lewis on trial with side issues regarding credibility. We review the ruling accordingly.

The trial court did not abuse its discretion (Evid. Code, § 352). "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler*, *supra*, 4 Cal.4th 284, 296.) Impeaching Lewis with inquiries into his own violent conduct—an inquiry that would not have borne on any question of veracity or honesty—would have been collateral. Moreover, the jury already knew that Lewis had committed two murders and that he had been a member of a prison gang. There was no abuse of discretion.

As for defendant's constitutional claim, we have repeatedly held that "not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." (*People v. Frye*, *supra*, 18 Cal.4th 894, 946.) The constitutional claim is without merit.

XXII. *Instruction on Considering Age*

 Defendant sought but was refused this instruction: "Mere chronological age is a factor over which one can exercise no control. It is not an aggravating factor." Instead, the trial court gave the jury two instructions on age. First, it directed: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if you find them to be applicable in this case: [¶] . . . [¶] (i) The age of the defendant at the time of the crime." (See § 190.3, factor (i).) But the court also instructed, at defendant's behest: "Mere chronological age, a factor over which one can exercise no control, should not of itself be deemed an aggravating factor or a mitigating factor."

In closing argument, the prosecutor said of the age instructions that "[a]ge by itself is not by definition either an aggravating circumstance or a mitigating circumstance," but that in a particular case "[y]ou can make of it . . . whatever you wish." In the case of an inexperienced and immature offender, age might be mitigating. But "in this case, if anything, age is a factor in aggravation, . . . because when the defendant committed this crime he was approximately 35, 36 years of age" and had not learned from prior crimes and punishments.

Defendant claims that giving the second instruction violated his right under the Eighth Amendment to the United States Constitution to have the trier of fact for penalty consider a broad range of mitigating evidence. (*Penry v. Lynaugh* (1989) 492 U.S. 302, 327-328 [109 S.Ct. 2934, 2951-2952, 106 L.Ed.2d 256].)

The trial court was relying on language in *People v. Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113]. We noted that "mere chronological age, a factor over which one can exercise no control, should not of itself be deemed an *aggravating* factor." (*Id.* at p. 789.) We proceeded in *Rodriguez* to say: "However, the sentencing jury is entitled to know that a defendant's crime *lacks* certain elements the state deems relevant to *leniency* in the choice of penalty. Thus, we see no impropriety in prosecutorial argument that a defendant is *less deserving of leniency* (as opposed to more deserving of death) than a younger, perhaps less sophisticated offender." (*Ibid.*) There was no error, and in any event, because defendant sought the instruction, he may not complain of it now. (*People v. Ochoa, supra,* 19 Cal.4th 353, 458-459.) We reject his claim.

XXIII. *Refusal to Unseal Portions of the Record*

 Defendant contends that the trial court violated the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and state law, when it denied his postjudgment motion, filed July 18, 1991, to unseal certain portions of the record on appeal. The court ruled in essence, in a tentative decision and order filed September 18, 1991, that apparently became final, that it lacked the authority to do so.

There was no constitutional violation. (*People v. Price* (1991) 1 Cal.4th 324, 492-494 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Nor was there a violation of state law. (*Ibid.*) Indeed, rule 39.51(b) of the California Rules of Court, put into effect March 1, 1997, provides: "All transcripts of in camera proceedings shall be sealed and copies provided only to the reviewing court and to counsel *for those parties present at the proceedings.*" (Italics added.) Rule 33.5(b), put into effect July 1, 1990, has the same effect.

XXIV. *Facial Validity of the 1978 Death Penalty Law; Other Subclaims*

Finally, defendant maintains that "the 1978 California death penalty statute is unconstitutional as a matter of state and federal law. He presents a series of arguments in favor of his view. But as ' "[a] general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. . . . We see no need to rehearse or revisit our holdings or their underlying reasoning." ' " (*People v. Ochoa, supra,* 19 Cal.4th 353, 478.)

In particular, defendant urges that various guaranties contained in the federal Constitution were violated by these instruction-based acts or omissions: failing to (1) identify which factors were aggravating and which were mitigating, (2) delete irrelevant mitigating factors, (3) define the meaning or alter the language of certain factors, (4) require written findings on the aggravating factors, and (5) require proof of all aggravating factors beyond a reasonable doubt, that aggravation outweighed mitigation beyond a reasonable doubt, and that death was the proper penalty beyond a reasonable doubt. We decline to reconsider our views on these claims, which we have repeatedly rejected. (*People v. Osband, supra,* 13 Cal.4th 622, 704-705 [subclaims 1 and 2]; *People v. Memro* (1995) 11 Cal.4th 786, 886-887 [47 Cal.Rptr.2d 219, 905 P.2d 1305] [subclaims 1, 3, 4, and 5]; *People v. Ochoa, supra,* 19 Cal.4th 353, 479 [subclaims 3, 4, and 5].)

In addition, defendant claims that the 1978 death penalty law, as interpreted by this court, is invalid for failing to adequately narrow the class of first degree murderers eligible for the death penalty. This claim, too, we have rejected. (*People v. Ochoa, supra,* 19 Cal.4th 353, 479.)

· And defendant claims that the discretion conferred on the district attorney of each county to seek the death penalty results in a county-by-county disparity in capital prosecutions, causing arbitrariness forbidden by the federal Constitution. This claim, too, we have rejected. (*People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also *People v. Ochoa, supra,* 19 Cal.4th 353, 479.)

Defendant further claims that "[t]he lack of any requirement of intercase or intracase proportionality review and of any meaningful such undertaking in this case at the time of trial or on appeal violates [his] Fourteenth Amendment right to equal protection . . . and the Fifth, Sixth, Eighth and Fourteenth Amendment[s] . . . ." Regarding intercase proportionality review, we have repeatedly rejected the claim. (E.g., *People v. Welch, supra,* 20 Cal.4th 701, 772.) Regarding intracase proportionality review, he is mistaken: such review is available on appeal. (*People v. Ochoa, supra,* 19 Cal.4th 353, 478.) But he does not seek it. (See also *People v. Memro, supra,* 11 Cal.4th 786, 887.)

Finally, defendant claims the trial court's apparent denial of his motion for a separate penalty phase jury violated the Eighth Amendment to the United States Constitution. But he does not accompany this claim with argument, and appears to concede that it is without merit. In any event, no reason appears for the court to have deviated from the legislative preference to use a single jury to determine guilt and penalty. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1059 [90 Cal.Rptr.2d 607, 988 P.2d 531].)

*Penalty Phase Conclusion*

In sum, we conclude that defendant did not suffer prejudicial error during the penalty phase of his trial.

## CONCLUSION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied August 23, 2000.